IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

|  |  |  |
|---|---|---|
| _____ ) | | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | |
| PUERTO RICO AQUEDUCT AND | ) | |
| SEWER AUTHORITY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| THE COMMONWEALTH OF PUERTO | ) | |
| RICO, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ ) | | |

<u>CONSENT DECREE</u>

TABLE OF CONTENTS

BACKGROUND ................................................................................................ 5

OBJECTIVES ................................................................................................ 11

I.      JURISDICTION AND VENUE .................................................................. 12

II.     PARTIES ................................................................................................ 12

III.    APPLICATION AND BINDING EFFECT ................................................. 13

IV.     DEFINITIONS ........................................................................................ 14

V.      REMEDIAL MEASURES AT SLUDGE TREATMENT SYSTEMS AT WATER
TREATMENT PLANTS ................................................................................... 22

VI.     NEW STS PLANTS AND SOLIDS HANDLING ........................................ 24

VII.    REMEDIAL MEASURES AT WASTEWATER TREATMENT PLANTS AND
SEWER SYSTEM EVALUATIONS ................................................................... 25

VIII.   PUERTO NUEVO COMBINED SEWER SYSTEM AND REGIONAL
WASTEWATER TREATEMENT PLANT ........................................................... 27

IX.     SEWER SYSTEM OPERATION AND MAINTENANCE PROGRAM AND
CONDITION ASSESSMENT PROGRAM WITH RESPECT TO THE PUERTO NUEVO
REGIONAL WASTEWATER TREATMENT PLANT SEWER SYSTEM ................. 29

X.      CAÑO MARTÍN PEÑA PROJECTS .......................................................... 38

XI.     PUERTO NUEVO RWWTP SEWER SYSTEM EVALUATIONS AND REPAIRS . 39

XII.    SPECIFIC REQUIREMENTS FOR THE AREAS OF CONCERN  IN THE PUERTO
NUEVO REGIONAL WWTP SEWER SYSTEM ................................................ 40

XIII.   MODIFICATION/PRIORITIZATION OF REMEDIAL MEASURES ....................... 42

XIV.    INTERIM EFFLUENT LIMITS FOR WTPS AND WWTPS ....................................... 46

XV.     INTEGRATED MAINTENANCE PROGRAM ........................................................ 48

XVI.    TRAINING AND ADDITIONAL REQUIREMENTS FOR OPERATORS ................ 49

XVII.   CONTINUED IMPLEMENTATION OF A PROCESS CONTROL SYSTEM .......... 50

XVIII.  SPILL RESPONSE AND CLEANUP PLAN ............................................................ 52

XIX.    MONITORING, RECORDS AND REPORTING REQUIREMENTS FOR
UNPERMITTED STS ....................................................................................... 53

XX.     WASTEWATER TREATMENT CAPACITY AND FLOW MANAGEMENT ......... 54

XXI.    REVIEW AND APPROVAL PROCEDURES ........................................................... 57

XXII.   PENALTIES ............................................................................................. 60

XXIII.  REMOVAL OF WWTPS AND STSS FROM  DESIGNATED STIPULATED

PENALTY PROVISIONS................................................................................. 73

XXIV.    REINCORPORATION OF WTPS OR WWTPS INTO DESIGNATED STIPULATED PENALTY PROVISIONS....................................................... 76

XXV.    BI-ANNUAL REPORTS ........................................................................ 77

XXVI.    TRIANNUAL PROGRESS MEETINGS.............................................. 81

XXVII.    FORCE MAJEURE ............................................................................... 82

XXVIII.    NOTICES.............................................................................................. 85

XXIX.    ACCESS TO THE FACILITIES .......................................................... 87

XXX.    RECORD RETENTION ........................................................................ 87

XXXI.    DISPUTE RESOLUTION .................................................................... 88

XXXII.    COMPLIANCE WITH APPLICABLE LAWS...................................... 90

XXXIII.    EFFECT OF SETTLEMENT ................................................................ 90

XXXIV.    RESERVATION OF RIGHTS .............................................................. 91

XXXV.    COSTS OF SUIT .................................................................................. 93

XXXVI.    PUBLIC COMMENT ........................................................................... 93

XXXVII.    MODIFICATIONS ............................................................................... 93

XXXVIII. RETENTION OF JURISDICTION ....................................................... 94

XXXIX.    EFFECTIVENESS AND TERMINATION ........................................... 94

## LIST OF APPENDICES

Appendix A – List of WWTPs Covered by Consent Decree (as of Date of Lodging)

Appendix B – List of WTPs Covered by Consent Decree (as of Date of Lodging)

Appendix C – List of Capital Improvement Projects under WWTP Consent Decree no longer necessary

Appendix D – List of Capital Improvement Projects under WTP Consent Decree no longer necessary

Appendix E – PRASA Prioritization System Description

Appendix F – List of WWTP Pump Stations Covered by Consent Decree (as of Date of Lodging)

Appendix G – Minimum Requirements to Develop S2OMP for Puerto Nuevo RWWTP Sewer System (referred to as Minimum Requirements to Develop S2OMP)

Appendix H – Base list of Remedial Measures to address Washwater Discharges at WTPs

Appendix I – Additional Remedial Measures for WWTPs and WTPs subject to Prioritization (referred to as "Capital Projects subject to Prioritization)

Appendix J – Base list of Remedial Measures for WWTPs
Appendix K– Minimum Requirements for Infiltration and Inflow (I/I) Study
Appendix L – Map of Areas of Priority for Sewer System Reconnaissance and Cleaning in portion of Puerto Nuevo RWWTP Sewer System (referred to as "Map of Priority Areas")
Appendix M –Minimum Requirements To Develop a FOG Control Program
Appendix N – EPA Reporting Form
Appendix O – Description of Caño Martin Peña Projects
Appendix P – Map for Sewer Inventory and Mapping of Barriada Figueroa Area
Appendix Q – Barriada Figueroa Area Project Report Minimum Requirements
Appendix R – Puerto Nuevo RWWTP Sewer System Areas of Concern (referred to as "Areas of Concern")
Appendix S – Interim Effluent Limits for Wastewater Treatment Plants
Appendix T – Interim Effluent Limits for Water Treatment Plants
Appendix U –Minimum Requirements of the Integrated Maintenance Program
Appendix V – Minimum Requirements for Corrosion Control Element of the IMP (referred to as Minimum Requirements for Corrosion Control Program)
Appendix W– Minimum Requirements for PRASA's SRCP
Appendix X – Monthly Average Permitted Flow

**BACKGROUND**

WHEREAS, Plaintiff, the United States of America, at the request of the Administrator of the United States Environmental Protection Agency (EPA), is filing a Complaint (the "Complaint") concurrently with lodging of this Consent Decree, alleging that Puerto Rico Aqueduct and Sewer Authority (PRASA) violated the Clean Water Act (CWA), 33 U.S.C. § 1251, et seq., and regulations promulgated thereunder, and PRASA's National Pollutant Discharge Elimination System (NPDES) Permits issued pursuant thereto, and/or EPA administrative orders issued pursuant to Section 309 of the CWA, 33 U.S.C. § 1319, with regard to the PRASA wastewater treatment plants ("WWTP") listed in Appendix A (List of WWTPs covered by Consent Decree), water treatment plants ("WTP") listed in Appendix B (List of WTPs covered by Consent Decree), and the sewers and appurtenances in the Puerto Nuevo Regional WWTP Sewer System;

WHEREAS, PRASA is a public corporation created by legislative enactment and existing under the Laws of Puerto Rico, 22 LPRA §§ 141, *et seq.*, as amended, to administer the aqueduct and sewer system of Puerto Rico;

WHEREAS, PRASA is a "municipality" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362;

WHEREAS, the Commonwealth of Puerto Rico is a "state" pursuant to Section 502 of the CWA, 33 U.S.C. § 1362;

WHEREAS, the Commonwealth of Puerto Rico is also joined as a party under Section 309 (e) of the CWA, 33 U.S.C. § 1319 (e), which requires the state in which a municipality is located to be joined as a party whenever the municipality is a party to a civil action brought by the United Sates under Section 309 of the CWA;

WHEREAS, the United States, on behalf of EPA, and PRASA previously have entered into judicial consent decrees intended to address alleged CWA violations at various PRASA WTPs, WWTPs, and WWTP Pump Stations, and Safe Drinking Water Act (SDWA) as to three (3) unfiltered WTPs and construction and operation of two WTPs;

WHEREAS, PRASA has also entered into an Amended Settlement Agreement with the Commonwealth of Puerto Rico on behalf of the Department of Health, with respect to alleged SDWA violations at PRASA WTPs (hereinafter referred to as "PRDOH Decree"). EPA works closely with PRDOH in overseeing PRASA's SDWA compliance and implementation of the PRDOH Decree;

WHEREAS, PRASA owns and operates the WTPs, WWTPs, Pump Stations and the Sewer Systems (including the Puerto Nuevo Regional WWTP Sewer System) addressed in the Complaint and in this Consent Decree;

WHEREAS, the Consent Decree relating to PRASA's Pump Stations was entered on or about July 2, 2003, and modified in 2007 (hereinafter referred to as "Pump Station Decree"), and was assigned civil action number 01-1709 (JAF);

WHEREAS, PRASA has completed all of the remedial measures required under the Pump Station Decree, including 111 remedial projects at a cost of approximately $16 million, as well as implementation of the EPA approved Integrated Preventive Maintenance Program ("IPMP")  and Spill Response and Cleanup Plan ("SRCP") relating to the WWTP Pump Stations;

WHEREAS, the Consent Decree relating to PRASA's WWTPs was entered on January 10, 2007 (hereinafter referred to as "WWTP Decree"), and was assigned civil action number 06-1624 (PG);

WHEREAS, PRASA has completed all the short term and mid-term remedial actions, certain capital improvement projects, the Preliminary Sanitary Sewer System Evaluation Plan (PSSSEP), the Sanitary Sewer System Evaluation Plan (SSSEP), and the Sanitary Sewer System Evaluation Plan 2 required under the WWTP Decree to date.  PRASA also implemented the SRCP, as well as the IPMP relating to the WWTPs.  PRASA has spent approximately $746 million as of Fiscal Year 2015 completing these remedial measures since 2006 when the Decree was signed by the United States and PRASA;

WHEREAS, PRASA, as a result of the measures taken completed all twenty (20) Capital Improvement Projects in the first term of the WWTP Decree.  Under the WWTP Decree, the following capital improvement projects were completed under the second term (T2) and third term (T3) projects:  E1 Torito (T2), Mayagüez (T2), Maunabo (T2), Playa Santa (T2), Ponce (T2), Morovis (T2), Boquerón (T2), and Ciales (T3). Some of the capital improvement projects required under the WWTP Decree are no longer necessary for a variety of reasons.  This Consent Decree will no longer require the Capital Improvement Projects identified in Appendix C to be completed by PRASA for the reasons set forth in Appendix C.

WHEREAS, the consent decree relating to the CWA violations at PRASA's WTPs was entered on August 24, 2010, and was assigned civil action number 3:10-cv-01365 (SEC).  This Consent Decree was modified and such modification was entered on August 29, 2012 (hereinafter referred to as the "WTP Decree");

WHEREAS, PRASA has completed all the short term and mid-term remedial actions, sixteen (16) capital improvement projects, capacity evaluation plans, operator training program, installation of  alternative power units ("APUs"), flow meters and high level indicators for all sludge treatment systems ("STSs") at PRASA's WTPs, instituted standard

operating procedures for filter backwashing and washing of process treatment units, and implemented standardized recordkeeping required under the WTP Decree. In addition, PRASA completed the construction of two new water filtration plants (Maizales WTP and Lares WTP), physically eliminated three (3) Public Water Systems (Cubuy, Espino and Río Prieto), and their respective unfiltered water Public Water Systems, and serves filtered water in compliance with the SDWA to the populations once served by the eliminated unfiltered sources. PRASA has spent approximately $140 million as of Fiscal Year 2015 completing these remedial measures;

WHEREAS, PRASA completed the capital improvement projects at the following WTPs: Anones (T1); Enrique Ortega (T1); La Julita (T1); La Plata-Aibonito (T1); Lares (T1); Las Marías (T1); Maginas (T1); Patillas (T1); Quebrada Arenas (T1); Quebrada Honda (T1); Tanamá (T1); Sergio Cuevas (T1); Yauco (T1); Canóvanas (T2); Jobos (T3) and La Plata-Aibonito (CE Phase I). Some of the capital improvement projects described under the WTP Decree are no longer necessary for the reasons set forth in Appendix D attached to the Decree. This Consent Decree will not require the capital improvement projects identified in Appendix D to be completed for the reasons set forth in Appendix D;

WHEREAS, PRASA has also spent approximately $850 million as of Fiscal Year 2015 in complying with the PRDOH Decree;

WHEREAS, EPA alleges that PRASA has, during the relevant time period, discharged pollutants without a NPDES Permit authorizing such discharge in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a); discharged pollutants in excess of the effluent limitations contained in PRASA's NPDES Permits for its WTPs and WWTPs in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a); failed to meet operation and maintenance provisions of the applicable NPDES Permits for its WTPs, WWTPs, including the Puerto Nuevo Regional

WWTP Permit as required by 40 CFR § 122.41(e) and in violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a); and failed to report discharges as required by the applicable NPDES Permits.  EPA further alleges that the Complaint states claims upon which relief may be granted against PRASA under Sections 301(a), 309, and 402 of the CWA, 33 U.S.C. §§ 1311, 1319, and 1342;

WHEREAS, Plaintiff, the United States, and PRASA recognized the existence of combined sewer systems tributary to the Puerto Nuevo Regional WWTP Sewer System and added Attachment 2, Combined Sewer Overflow (CSO) Permit Conditions, to the Puerto Nuevo NPDES Permit issued in 2011, and amended in 2012 and 2014.  PRASA has expended approximately $10 million to date to characterize, model, monitor, clean, inspect, document and plan for CSO control in accordance with the permit requirements and good engineering practices, and towards the purchase of equipment and materials for the Sewer System operation and maintenance program;

WHEREAS, the express purpose of the United States and PRASA entering into this Consent Decree is to resolve the claims alleged in the Complaint, and to address the requirements contained in the Prior Consent Decrees related to the allegations set forth in the Complaint, with the goal of implementing a system-wide NPDES Permit compliance plan, continued implementation of an operation and maintenance plan at all PRASA Facilities, and implementation of remedial measures to address discharges at the Facilities to further the goals of the CWA.  The United States and PRASA recognize that the Work being done under this Decree will enable PRASA to better understand its Sewer Systems, but will not resolve all of its CWA obligations with respect to the Sewer Systems;

WHEREAS, it is also the express purpose of the United States and PRASA entering into this Consent Decree to address alleged CWA violations occurring within the Puerto Nuevo Regional WWTP Sewer System;

WHEREAS, PRASA acknowledges that the CWA violations alleged in the Complaints filed in 2006 and 2010 are continuing to date at some of the Facilities identified, since ongoing and prospective capital improvement projects necessary to achieve CWA compliance under the WWTP and WTP Consent Decrees respectively have not been completed at certain Facilities to date;

WHEREAS, PRASA provides wastewater and drinking water services to approximately 3.5 million residents of the Commonwealth of Puerto Rico (including two islands off the main island). The assets PRASA operates and maintains providing these services include 52 WWTPs, 119 WTPs, eight (8) dams, and more than 3,500 ancillary facilities (water storage tanks, pump stations and wells);

WHEREAS, PRASA has documented that it has extremely limited financial resources to address all of the necessary regulatory environmental projects and infrastructure projects concerning the operation of its WWTPs, WTPs, Pump Stations and Sewer Systems. PRASA's financial situation, which includes, among other factors, the downgrade to below grade bond status in the bond market, the decline in population in Puerto Rico and lower revenues as a result of this decline, and higher expenses, has severely affected its ability to borrow money to address its regulatory environmental obligations. To address its limited financial resources, PRASA has developed a "Prioritization System" (description is attached as Appendix E) to provide an objective and systematic guideline to prioritize the implementation of infrastructure projects and required regulatory projects. PRASA consulted with and sought input from both

EPA and PRDOH during the development of its Prioritization System, and PRASA used their input to refine the Prioritization System as appropriate;

WHEREAS, PRASA has provided extensive financial documentation to the United States to verify PRASA's allegations of financial hardship. Taking into consideration the economic impact of a civil penalty and PRASA's documented inability to pay a penalty, the United States is waiving the civil penalty associated with the violations alleged in the Complaint;

WHEREAS, the Plaintiff, the United States of America and PRASA, agree to supersede the Prior Consent Decrees and include certain Puerto Nuevo Regional WWTP Sewer System NPDES Permit CWA requirements in this Consent Decree, as provided herein;

WHEREAS, Plaintiff, the United States of America and PRASA, without making any admission of fact or law, or evidence of same, or of any violation of any permit, law or regulation, agree that: (i) settlement of these unresolved matters in accordance with this Consent Decree is in the best interests of the United States, PRASA and of the public; and (ii) entry of this Consent Decree without further litigation is the most expeditious, economic and appropriate means of resolving this action and the remaining obligations in certain Prior Consent Decrees;

NOW THEREFORE, without admission by PRASA of the non-jurisdictional allegations in the Complaint and upon consent of the United States and PRASA, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## OBJECTIVES

It is the express purpose of the United States and PRASA in entering into this Consent Decree to further the objectives of the CWA, as enunciated at Section 101, 33 U.S.C. § 1251,

to eliminate unauthorized discharges, to address NPDES Permit effluent limitation exceedances, implement proper operation and maintenance at the Facilities, and to supersede certain Prior Consent Decrees to the extent and in the manner set forth in this Consent Decree. All plans, reports, construction, remedial measures, and other obligations in this Consent Decree or resulting from the activities required by this Consent Decree shall have the objective of furthering PRASA's ability to come into and remain in full compliance with the CWA, and with the terms and conditions of its NPDES Permits.

## I.        JURISDICTION AND VENUE

1.      This Court has jurisdiction of the subject matter and over the parties to this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355 and Section 309 of the CWA, 33 U.S.C. § 1319.  PRASA consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree.  Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c) and § 1395(a).

## II.        PARTIES

2.      The Parties to this Consent Decree are as follows:

a.      The United States, being the Plaintiff United States of America, on behalf of the United States Environmental Protection Agency; and

b.      PRASA, being Defendant Puerto Rico Aqueduct and Sewer Authority, a public corporation created by legislative enactment and existing under the Laws of Puerto Rico, 22 LPRA § 141, *et seq.*, as amended, to administer the aqueduct and sewer system of Puerto Rico.

c.      The Commonwealth of Puerto Rico is a signatory to this Consent Decree solely and exclusively as a party whose joinder is mandatory pursuant to Section 309(e) of the Clean

Water Act, 33 U.S.C. Section 1319(e).  The Commonwealth will have no liability under this

Consent Decree except, as set forth in Section 309(e), to the extent that the laws of the

Commonwealth of Puerto Rico prevent PRASA from raising revenues needed to comply with

this Consent Decree.  The Commonwealth represents that its present laws do not prevent

PRASA from raising revenues needed to comply with this Consent Decree.  The

Commonwealth specifically reserves all defenses to any claims pursuant to Section 309(e),

including among other defenses that Commonwealth law does not prevent PRASA from

raising revenues needed to comply with such judgment.  The Commonwealth's signature on

this document shall not itself be deemed to be a waiver of sovereign immunity.

## III.        APPLICATION AND BINDING EFFECT

3.      The provisions of this Consent Decree shall apply to, inure to the benefit of, and

be binding upon the United States, on behalf of EPA; PRASA, its officers, directors,

employees, successors in interest and assigns, and upon all persons, agents, firms, subsidiaries,

divisions, and corporations acting under or for them, including any entity which may enter into

a contract with PRASA to operate any Facility and Sewer System governed by this Consent

Decree, and such contractor's officers, agents, directors, employees, parent and related

companies, subsidiaries, successors in interest and assigns.  The Appendices to this Consent

Decree are incorporated herein and shall have the same force and effect as all provisions

hereto.  The undersigned representatives of the United States and PRASA certify that they are

fully authorized to enter into this Consent Decree and to execute and to bind legally each

signatory to this Consent Decree.

4.      Effective from the Date of Lodging of this Consent Decree until its termination,

PRASA shall give written notice of this Consent Decree to any person or entity to whom

-13-

PRASA may transfer ownership or operation of any of the Facilities, affected by the terms and requirements of this Consent Decree, and shall provide a copy of this Consent Decree to any such person or entity.  PRASA shall notify EPA and the United States Department of Justice in writing of any successor in interest at least twenty-one (21) days prior to any such transfer.

5.     PRASA shall make a copy of this Consent Decree available to each engineering, consulting and contracting firm to be retained to perform the Work or any portion thereof required by this Consent Decree upon execution of any contract relating to such Work, and shall inform each such engineering firm, consultant or contractor of the terms of this Consent Decree, and shall also so inform each engineering, consulting and contracting firm already retained no later than thirty (30) days after the Date of Lodging of this Consent Decree.  Any action taken by any engineering firm, contractor or consultant to implement PRASA's duties under this Consent Decree shall be considered an action of PRASA for purposes of determining compliance with this Consent Decree.

6.     In any action to enforce this Consent Decree, PRASA shall not raise as a defense the failure by any of its agents, contractors, subcontractors, employees, successors or assigns to take actions necessary to comply with this Consent Decree, except as provided under Section XXVII (Force Majeure) of this Consent Decree.  This Section shall not limit PRASA's right to take all appropriate action against any person or entity that causes or contributes to PRASA's failure to perform.

## IV.        DEFINITIONS

7.     Unless otherwise defined herein, the terms used in this Consent Decree will have the meaning given to those terms in the CWA, 33 U.S.C. § 1251 *et seq*., and the

regulations promulgated thereunder.  The following terms, as used in this Consent Decree and for purposes of this Consent Decree only, will be defined as follows:

a.   The term "Alternate Power Unit" or "APU" shall mean any device for electricity generation in case of failure of the primary electrical system.

b.   The term "Bi-annual Report" shall mean the six (6) month progress report to be submitted by PRASA to EPA pursuant to Section XXV (Bi-annual Reports) of this Consent Decree.

c.   The term "Combined Sewer Overflow Outfall" or "CSO Outfall" shall mean, for the purpose of this Consent Decree only, any outfall currently identified and authorized, or identified and authorized in the future, as a combined sewer overflow or CSO in any of the PRASA's Wastewater Treatment Plant's NPDES Permits.

d.   The term "Combined Sewer Overflow" or "CSO" shall mean any discharge from any NPDES Permit CSO Outfall.

e.   The term "Combined Sewer Systems" or "CSS" shall mean the collection and transmission system, and appurtenances thereto, that conveys municipal sewage (wastewater from residences, commercial buildings, industrial facilities and institutions), and stormwater, through a single pipe system to a PRASA's Wastewater Treatment Plant and/or a CSO Outfall as included in a NPDES Permit.

f.   The term "Commencement of Physical Construction" shall mean mobilization of the contractor to the construction site of the project to be constructed, following completion of any necessary procurement steps and issuance of any necessary notice to proceed.

g.     The term "Complaint" shall mean the Complaint filed by the United States in this action captioned United States v. Puerto Rico Aqueduct and Sewer Authority, et al., Civ. No. _____.

h.     The term "Consent Decree" or "Decree" shall mean this Consent Decree, including all Appendices hereto, and any modifications made hereto.

i.     The term "Date of Lodging" shall mean the date on which this Consent Decree is filed for lodging with the Clerk of the Court for the United States District Court for the District of Puerto Rico.

j.     The term "Date of Entry" shall mean the date on which this Consent Decree is approved and signed by the Judge for the United States District Court for the District of Puerto Rico.

k.     Unless otherwise indicated, the term "Day" or "Days" as used herein shall mean a calendar day or days.  References to working days shall mean days of the week other than Saturdays, Sundays, holidays, and days containing half-holidays.  In computing any period of time under this Consent Decree, if the last day would fall on a Saturday, Sunday or federal or Commonwealth holiday, the period shall continue until the next day other than a Saturday, Sunday, or holiday.

l.     The term "Deliverable" shall mean any written plan, report, map, or other document required to be submitted by PRASA to EPA pursuant to the Consent Decree including its appendices and any updates thereto.

m.     The term "Dry Weather Overflow" or "DWO" shall mean for purposes of this Consent Decree only, Combined Sewer Overflow that cannot be attributed to a precipitation event within the hydraulically connected Sewer System.  DWOs can include flows from one or

more of the following:  domestic sewerage, groundwater infiltration, inflow, illicit connections, commercial and industrial wastewater, and any other non-precipitation event related flow (e.g., discharge of tidal infiltration and/or any connections downstream of the regulator to the outfall pipe).

n.    Unless otherwise indicated, "Facility" or "Facilities" shall refer collectively to the Wastewater Treatment Plants ("WWTPs"), Sludge Treatment Systems ("STSs") at the Water Treatment Plants ("WTPs"), and Pump Stations respectively identified in Appendices A (List of WWTPs Covered by CD), B (List of WTPs Covered by CD) and F (List of WWTP Pumping Stations Covered by CD) of this Consent Decree.

o.    The term "I/I" shall mean the total quantity of flow from both infiltration and inflow without distinguishing the source.

p.    The term "Infiltration" shall mean water other than wastewater that enters a Sewer System as defined by 40 C.F.R. § 35.2005 (b)(20).

q.    The term "Inflow" shall mean the water other than wastewater that enters a Sewer System, as defined by 40 C.F.R. § 35.2005(b)(21).

r.    Unless otherwise indicated, the term "NPDES Permit" or "Permit" as used herein shall mean the National Pollutant Discharge Elimination System Permit issued to PRASA for each of its WTPs and WWTPs, and shall include renewals, modifications and revisions thereof.

s.    Unless otherwise indicated, the term "Prior Consent Decrees" shall mean the consent decrees between the United States and PRASA referred to herein as the Pump Station Decree, the WWTP Decree and the WTP Decree.

t.    The term "Prioritization System" shall mean a comprehensive and holistic project scheduling methodology utilized by PRASA to prioritize and plan the expenditures and implementation of capital improvement projects to meet environmental and regulatory obligations for drinking water, wastewater and sludge treatment.  The Prioritization System takes into consideration regulatory and environmental compliance, quality of service and reliability, operational requirements and needs, as well as population served by a specific capital improvement project.  Specific criteria have been defined and a scoring methodology has been developed in order to objectively rank and prioritize the capital improvement projects PRASA shall undertake.  A copy of the Prioritization System description which defines and describes in more detail the Prioritization System is attached as Appendix E.

u.    The term "Pump Station" shall mean the integrated entity composed of the last manhole in the gravity sewer line segment that feeds the wet well, the sewer pipe portion in that section, the entrance channel(s), the wet well, bar screen rack and/or comminutor, back flow preventer, the dry well, the pump housing, level indicators, float switches and controllers, plug valves, check valve, air exhaust/ventilation system, the electrical motor control center ("MCC") and /or control panels, transfer switch, Alternate Power Unit ("APU") and its fuel tank, the force main which may extend towards the facility property limits, and any other component that is associated with lifting wastewater to higher elevation.  The term "Pump Station" in this Decree shall refer only to the Pump Stations that are appurtenances to the WWTPs owned and operated by PRASA, and identified in Appendix F (List of WWTP Pump Stations Covered by Consent Decree).

v.    The term "Responsible Official" shall mean the principal executive officer of PRASA or a duly authorized representative, as defined by 40 C.F.R. § 122.22.

w.   The term "Sanitary Sewer Overflow" or "SSO" shall mean for purposes of this Consent Decree only, any discharge, diversion, overflow, spill or release to the waters of the United States from or caused by the Sanitary Sewer System through point sources not specified in any NPDES Permit, as well as any release of wastewater from or caused by the Sanitary Sewer System to public or private property that does not reach waters of the United States. However, if PRASA confirms SSOs are caused by laterals, other piping, or conveyance system not owned or controlled by PRASA, those are not SSOs for the purpose of this Consent Decree.

x.   The term "Sanitary Sewer System" shall mean for purposes of this Consent Decree only, a sewer intended to carry only sanitary or sanitary and industrial wastewaters from residences, commercial buildings, industrial plants, and institutions as defined by 40 CR Part 35, Subpart E, Section 35.905. It includes all portions of the Sewer System that are not part of a Combined Sewer System.

y.   The term "Sewer System" shall mean for purposes of this Consent Decree only, the wastewater collection and transmission system (included, but not limited to: pump stations, pump station's force mains, gravity sewer pipes/pipelines, overflow structures, weirs, manholes, etc.) owned and/or operated by PRASA that collects and conveys municipal sewage (domestic, commercial, industrial, institutional) to PRASA's wastewater treatment plants or to a Combined Sewer Overflow Outfall. Sewer System includes both the "Combined Sewer System" and the "Sanitary Sewer System."

z.   The term "Sewer System Operation and Maintenance Program" or "S2OMP" shall mean, for the purposes of this Consent Decree only, a program to manage, operate, and maintain the Sewer System in a manner consistent with wastewater collection system industry

practice, to investigate capacity-constrained Sewer System areas, and respond to SSO and CSO events.  The minimum requirements to develop the S2OMP are set forth in Section IX (Sewer System Operation and Maintenance Program and Condition Assessment Program with Respect to the Puerto Nuevo Regional WWTP Sewer System) and in Appendix G attached to this Consent Decree.

aa.   The term "Sewer System Reconnaissance" shall mean the inspection activities performed by PRASA that includes the application of appropriate industry proven technologies to confirm and/or update the information as appropriate on existing maps, and where necessary, to identify and/or update the spatial coordinates of manholes for geo-referencing, identify sewer segments requiring cleaning, identify Sewer System interconnections (storm, sanitary, etc.), validate the location of suspected Sewer System interconnections, identify and record any conditions impeding the sewer function and assign PRASA asset identifiers.  The inspections of the Sewer System will be performed using, but not limited to, visual observations, smoke test, sonar tests, dye tests, and a pole mounted camera system, which allows an inspection of the manhole structure and all incoming and out-going sewer pipes within the structure without physically entering the manhole.

bb.   The term "Sludge Treatment System" or "STS" shall mean a series of processes that collects and/or recycles the Washwater Discharges and subjects all such discharges, and any other discharges with which they are comingled, to physical and/or chemical treatment.

cc.   The term "submit," in regard to documents required to be submitted pursuant to this Consent Decree, shall mean the date the document is placed in the express mail, certified mail, and/or electronic/mail, express courier service, unless otherwise specifically stated.

dd.   The term "Substantial Completion" or "Substantially Complete" shall mean, when used in reference to construction projects required under this Consent Decree, the date, as certified by the Professional Engineer in charge of a construction project, when the construction project or specified part thereof is sufficiently completed, in accordance with the design specifications, such that the project or specified part thereof accomplishes the purposes for which it was intended.

ee.   The term "United States" shall mean the United States of America, acting on behalf of EPA.

ff.   The term "Unauthorized Release" shall mean any overflow, spill, diversion, or release of wastewater within the Sewer System at a location other than a CSO Outfall or that which is a confirmed SSO.  This term shall include any release of wastewater from the Sewer System to public or private property that does not reach waters of the United States.  However, if PRASA confirms such release of wastewater is caused by laterals, other piping, or conveyance system not owned or controlled by PRASA, those releases will not be considered Unauthorized Releases for purposes of this Consent Decree.

gg.   The term "Washwater Discharges" for purposes of Section V (Remedial Measures at Sludge Treatment Systems at WTPs) and Section VI (New STS Plants and Solids Handling) of this Consent Decree only, shall mean spent filter backwash waters and presedimentation/sedimentation tank wash waters that comes from cleaning the water treatment filters.  The process to clean the filters is referred to as filter backwash. The water used to clean the filters is expected to be treated at a sludge treatment system prior to discharge to a receiving water body.

hh.   The term "Wastewater Treatment Plant" or "WWTP" shall mean the devices or systems of a Publicly Owned Treatment Works, as defined by 40 C.F.R. § 122.2, which is designed to provide treatment (including recycling and reclamation), and storage of municipal sewage and industrial waste, and shall include all of its outfalls as identified in PRASA's respective NPDES Permits, and those portions of the collection and transmission system from the WWTP up to the last manhole of the pump stations nearest to the plant.

ii.   The term "Water Treatment Plant" or "WTP" shall mean that portion of the public water system that provides treatment of raw water and treatment of resulting Washwater Discharges, including but not limited to rapid mixers, flocculators, filters, sedimentation tanks and sludge treatment systems.

jj.   The term "Work" shall mean all activities PRASA is required to perform under this Consent Decree.  Work under this Consent Decree shall be performed using best engineering practice, best professional judgment and industry standards in compliance with the objectives and terms of this Consent Decree and its Appendices.

## V.        REMEDIAL MEASURES AT SLUDGE TREATMENT SYSTEMS AT WATER TREATMENT PLANTS

8.   Under this Decree, PRASA shall implement remedial measures to address Washwater Discharges at WTPs owned and/or operated by PRASA in accordance with Appendix H (Base list for Remedial Measures to address Washwater Discharges at WTPs) and Appendix I (Capital Projects subject to Prioritization).  The United States and PRASA agree that these remedial measures will be completed by the deadlines set forth in Appendices H and I.  The projects identified in Appendix H are estimated to cost $72 million.

9.    PRASA shall ensure that all WTPs have Flow Meter Devices installed and in operation.  For purposes of this Section, the term Flow Meter Devices shall be defined as equipment that captures and records the washwater for WTPs and for every discharge point indicated in the applicable NPDES Permit.  The term Flow Meter Devices under this Section also includes the installation and use of flow totalizers to capture amount of flow discharged within a twenty four (24) hour period for WTPs that discharge effluent intermittently.

10.    The Flow Meter Devices shall be used with methods to measure flow that are consistent with flow measurement methods that are the accepted scientific and industry practices to ensure the accuracy and reliability of measurements of washwater for WTPs.  The Flow Meter Devices shall be capable of measuring flow with maximum deviation of plus or minus 10 percent.  Calibration records for any of the flow meter devices shall be kept for at least three (3) years from the date the last calibration was performed.  A label indicating current and future dates of calibration, and signed by the calibration technician must be affixed to the Flow Meter Device.  The sampling point for the discharge shall be located in the area immediately after the installed Flow Meter Device, unless otherwise specified in the applicable NPDES Permit.

11.    PRASA shall ensure that all WTPs have High Level Indicators installed and in operation. For purposes of this Section, the term "High Level Indicator" shall mean high level sensors with visual indicators or alarms so as to indicate when WTP washwaters reach a level just prior to having an overflow from the tank.

12.    The High Level Indicators shall be installed in such a manner as to provide sufficient time for the operator to take all measures required to avoid the discharge of pollutants into waters of the United States.

## VI.        NEW STS PLANTS AND SOLIDS HANDLING

13.    Any new PRASA WTP that begins operation after the Date of Lodging shall include an APU and a STS with sufficient hydraulic capacity to manage Washwater Discharges.

14.    Any STS of any new PRASA WTP that begins operation after the Date of Lodging shall comply with all the terms of this Consent Decree.  PRASA further agrees to submit to EPA a NPDES Permit application in accordance with 40 C.F.R. § 122.21 at least 270 days prior to completion of construction of any STS at a PRASA WTP.  PRASA will also inform of the Commencement of Physical Construction of any STS at any PRASA WTP in the corresponding Bi-annual Reports.

15.    Once a STS is constructed and operational, all sludge generated due to the STS operation shall be:

a.    Disposed of in compliance with the applicable requirements established in 40 CFR Part 257.  A semi-annual report that is required pursuant to 40 CFR Part 257 shall be submitted to both EQB and EPA notifying them of the method or methods used to dispose of the sludge generated by the STS during the prior six (6) month period.  PRASA shall also submit with the initial semi-annual report a copy of the approval or permit received from EQB, as applicable, for the disposal method used.  If the disposal method used changes for a particular STS, PRASA shall submit with the semi-annual report submitted pursuant to 40 CFR Part 257 to both EQB and EPA, a copy of the permit or approval received from EQB, as applicable, for the disposal method used.

b.    Transported adequately in such a way that the sludge is not discharged to any water body or soil.  In the event of a spill of sludge on land or into a body of water, PRASA

shall notify the Point Sources Permits Division of EQB's Water Quality Area as indicated in the NPDES Permits and shall notify EPA within twenty-four (24) hours.

16.    Once the STS is constructed and operational, a log book must be kept for the sludge removed detailing the following items:

a.    Description of the sludge removed, date sludge was removed and source of the sludge;

b.    Approximate volume and weight of the sludge removed;

c.    Method by which sludge was removed and transported;

d.    Final disposal and location of the sludge removal; and

e.    Name of the company or individual that performs the service transportation of the sludge.

17.    A copy of the Non-Hazardous Solid Waste Collection and Transportation Services Permit issued by the authorized official from EQB must be attached to and kept with the aforementioned log book as required by the NPDES Permit.  PRASA must retain the information in the log book for at least two (2) years from the date sludge was removed from the STS.

**VII.        REMEDIAL MEASURES AT WASTEWATER TREATMENT PLANTS AND SEWER SYSTEM EVALUATIONS**

18.    PRASA shall implement remedial measures to address CWA violations at all of the WWTPs owned and/or operated by PRASA in accordance with Appendix J (Base list of Remedial Measures for WWTPs) and Appendix I (Capital Projects subject to Prioritization). The projects identified in Appendix J are estimated to cost $138 million.

19.     As part of the requirements of Appendix J (Base list of Remedial Measures for WWTPs), PRASA shall no later than December 31, 2016, provide an assessment of the Infiltration/Inflow (I/I) of all PRASA's Sewer Systems except for the seven Sewer Systems where I/I studies have already been completed by PRASA.  The assessment shall be submitted to EPA for review and approval, and indicate which Sewer System under the assessment requires an individual I/I study.  The dates for I/I studies to be completed for each Sewer System identified as requiring a study in the assessment shall be established under the Prioritization System.  The I/I Studies performed by PRASA shall meet the minimum criteria established in Appendix K (Minimum Requirements for I/I Study) of this Consent Decree.  All repairs and/or remedial actions deemed necessary by the I/I study in that particular Sewer System shall also be established under the Prioritization System.  However, if the repairs and/or remedial actions required by the I/I study at a particular Sewer System cannot be completed within five (5) years of the date of the I/I study, PRASA shall update the I/I study to address any new conditions or changes to the particular Sewer System before implementing all necessary repairs and/or remedial actions.

20.     For the seven Sewer Systems (Aguadilla, Bayamón, Isabela, Juncos, La Parguera, San Sebastián and Unibón Morovis) covered by the SSSEP and Sanitary Sewer System Repair Plan 1 (SSRP1) requirements of the 2006 WWTP Consent Decree, the study found necessary repairs pertaining to Bayamón, Isabela, Juncos, San Sebastián New and Unibón/Morovis.  The schedule for these repairs are included in Appendix I (Capital Projects subject to Prioritization).  The United States and PRASA agree it is not the purpose of this Consent Decree to require PRASA to implement system-wide changes that may be needed to its Sewer Systems with the exception of the Puerto Nuevo RWWTP Sewer System as

addressed in Sections VIII through XII of this Decree.  EPA reserves its rights to bring claims

for penalties for violations of the CWA relating to PRASA's Sewer Systems, and to seek

injunctive relief requiring implementation of system-wide remedial measures to any portion of

its Sewer Systems.

## VIII.  PUERTO NUEVO COMBINED SEWER SYSTEM AND REGIONAL WASTEWATER TREATEEMENT PLANT

21.  Combined Sewer Systems Compliance.

a.  <u>Compliance with NPDES Permit</u>: PRASA shall at all times comply with all the

requirements of its NPDES Permit, including all effluent limitations applicable to Outfall 001

in the Puerto Nuevo Regional Wastewater Treatment Plant (RWWTP)'s Permit and with the

requirements set forth in that Permit concerning Combined Sewer System discharges that may

occur during wet weather periods when the flow in the Sewer System exceeds the design

capacity of the Sewer System.

b.  <u>Nine Minimum Controls ("NMC") Compliance</u>.  In addition to the reporting

requirements in Attachment 2 of the NPDES Permit (effective December 1, 2011,  and

amended in June 5, 2012 and March 21, 2014), and beginning on November 30, 2015, and

continuing each year thereafter until this Consent Decree terminates, PRASA shall submit to

EPA for review and approval a revised NMC Report addressing all comments submitted by

EPA to any of PRASA's NMC submissions during the previous twelve months if the

comments have not been previously addressed by PRASA, including documentation

demonstrating the status of PRASA's compliance with each of the NMCs for the CSOs as set

forth in EPA's 1994 CSO Control Policy.  PRASA shall continue to identify and address each

comment raised by EPA in its submissions to PRASA by the date specified by EPA when it

sends its comments to PRASA. If PRASA is unable to document in the submittal that all NMC requirements are being met, the submittal shall also include proposed projects to be performed with compliance schedules for EPA review and approval to ensure that compliance with the NMCs is achieved.   In preparing the documentation of the NMC compliance status and the proposed projects, PRASA shall use as guidance the "Guidance for Nine Minimum Controls", EPA 832-B-95-003, May 1995.

     c.   To date PRASA has submitted pursuant to the Puerto Nuevo RWWTP Permit, and will continue to submit as practicable given the condition of the Puerto Nuevo RWWTP Sewer System, to EPA for review and approval the following documents listed below in connection with future Long Term Control Plan ("LTCP") development.  The series of reports submitted to date demonstrate that efforts to complete the characterization and subsequent remedial planning must be phased to address the findings of the necessary Sewer System Reconnaissance.  EPA intends to include requirements for the LTCP development under a future enforceable document.  EPA has provided and will continue to provide comments to PRASA, as appropriate, for PRASA to address in revisions to the submissions identified below:

      i.    Quality Assurance Project Plan and Sampling and Analysis Protocols for the Puerto Nuevo RWWTP (December 2012);
    ii.     CSO Baseline Demonstration Studies (October 2013);
   iii.    2012 Santurce Sanitary Sewer System Nine Minimum Controls Report (May 2012 and November 2013);
    iv.    Combined Sewer System Characterization, Monitoring and Modeling Plan (November 2012);
     v.    2013 Report for the Puerto Nuevo RWWTP CSO Baseline Demonstration Studies (October 2013);
    vi.    2013 Combined Sewer System Characterization, Monitoring, and Modeling Report (November 2013);
   vii.    Public Participation Plan for the Puerto Nuevo Wastewater Treatment Plant

Combined Sewer System; and

viii.    2014 Combined Sewer Consolidated Characterization, Monitoring and Modeling and Nine Minimum Controls Report (December 2014).

d.    For N ovember 2015 a nd be yond s ubmissions unde r t his P aragraph, P RASA may s ubmit t he N MC R eport ("NMCR") and t he C ombined S ewer S ystem C haracterization, Monitoring and Modeling R eport ("CMMR") in one combined report provided that the report submitted has distinct sections that cover the NMCR and the CMMR.

## IX.    SEWER SYSTEM OPERATION AND MAINTENANCE PROGRAM AND CONDITION ASSESSMENT PROGRAM WITH RESPECT TO THE PUERTO NUEVO REGIONAL WWTP SEWER SYSTEM

22.    The Sewer System Operation and Maintenance Plan (S2OMP). No later than December 1, 2015, PRASA shall meet with EPA to report on the status of the development and implementation of the S2OMP.  No later than June 30, 2016, PRASA shall submit to EPA for review and approval a S2OMP for the Sewer System hydraulically connected to the Puerto Nuevo RWWTP in accordance with the minimum requirements set forth in Appendix G (Minimum Requirements to Develop S2OMP for Puerto Nuevo RWWTP Sewer System), and the requirements set forth herein in this Decree, to properly operate and maintain the Puerto Nuevo RWWTP Sewer System, to eliminate SSOs and Unauthorized Releases and control CSOs. As part of the S2OMP development, PRASA shall provide preventive maintenance services (which includes at a minimum Sewer System Reconnaissance; Sewer Cleaning; Fats, Oil and Grease Control and SSO, DWO and Unauthorized Release Prevention and Control) of its Sewer System.  The S2OMP will evolve and improve as additional information is gathered about the Sewer System.  Any minor revisions to the S2OMP shall be addressed in the Progress Meetings held between the EPA and PRASA.  Submittal of the revised S2OMP to EPA shall be provided upon request and may include modifications at EPA's request.  Any

modifications proposed by PRASA to the S2OMP that would affect the achievement of the

S2OMP goals, shall be submitted to EPA for review and approval.

      a.     The S2OMP submitted to EPA for review and approval shall include the

following key S2OMP elements: (1) clear defined purpose(s) and/or goal(s) of the S2OMP and

measures PRASA will use to track progress towards achieving the defined purpose(s) and/or

goals of the S2OMP; (2) specific descriptions of the activities PRASA will undertake to

comply with the S2OMP in accordance with the minimum requirements set forth in Appendix

G (Minimum Requirements to Develop S2OMP for Puerto Nuevo RWWTP Sewer System);

(3) description of the trained personnel PRASA will utilize to implement the S2OMP activities;

(4) established performance measures to assess the effectiveness of the S2OMP activities  in

controlling CSOs, reducing SSOs and Unauthorized Releases and eliminating DWOs,

protecting water quality and improving the operation and maintenance of the Puerto Nuevo

RWWTP's Sewer System; and (5) written procedures for  establishing  periodic review of the

effectiveness of the S2OMP.

      PRASA shall begin implementation of the S2OMP immediately upon submittal to

EPA of the S2OMP.  EPA and PRASA shall meet to discuss implementation of the S2OMP

shortly after submittal to EPA.  EPA shall use its best efforts to provide comments to PRASA

within forty-five (45) calendar days of the meeting date where the S2OMP was discussed.

PRASA shall implement in the S2OMP any comments received by EPA within the timeframe

agreed to by EPA and PRASA.  If PRASA disagrees with any comments received by EPA,

PRASA shall meet with EPA within thirty (30) calendar days to discuss any particular

comment in dispute.  However, all other parts of the S2OMP not in dispute shall be

implemented by PRASA according to the deadline set forth in this sub-paragraph. Within ten

(10) Days of the meeting to discuss any EPA comments in dispute, PRASA shall implement EPA's comments or invoke Dispute Resolution under Section XXXI (Dispute Resolution) of this Decree.

b.    PRASA shall submit an annual report on the status of the implementation of the S2OMP (hereinafter referred to as "S2OMP Annual Report") in accordance with the minimum requirements to develop the S2OMP as set forth in Appendix G no later than January 30, 2017, and on that date each year thereafter until the Decree is terminated. The S2OMP Annual Report shall discuss all S2OMP activities undertaken during the calendar year, the amount of funds spent on S2OMP activities, how the funds were allocated among the S2OMP activities, and PRASA's efforts to increase the allotted operation budget for S2OMP activities.  PRASA may choose to submit the S2OMP Annual Report at the time PRASA submits every other Bi-annual Report; however, the S2OMP Annual Report must be a distinct and separate report that addresses the requirements of this Section.  PRASA shall commit to spend no less than seven million dollars ($7,000,000) per year on S2OMP activities.  If after March 30, 2022, the amount spent on S2OMP activities per year has not increased, PRASA shall meet with EPA no later than June 30, 2022, to discuss all of its efforts to increase the amount of funding spent on S2OMP activities.

23.    Sewer System Reconnaissance Element.  As part of the S2OMP, PRASA shall conduct Sewer System Reconnaissance of all of the sewers hydraulically connected to the Puerto Nuevo RWWTP Sewer System to enable complete inspections, observation and cleaning of the sewers.  During Sewer System Reconnaissance PRASA shall undertake appropriate measures to eliminate blockages and overflows within the Puerto Nuevo RWWTP Sewer System in accordance with the EPA approved SRCP.  The Sewer System

Reconnaissance of the areas identified on map, attached as Appendix L (Map of Priority Areas) to this Decree, shall be completed no later than three (3) years from the Date of Lodging.

a.    If during the Sewer System Reconnaissance or at any other time, PRASA identifies interconnections to or from its Sewer System, PRASA shall notify EPA of the location (including spatial coordinates) to the following EPA SharePoint Site entitled "Puerto Nuevo RWWTP Notifications" within twenty-four (24) hours of discovering the interconnection.  PRASA shall also include in the Bi-annual Reports submitted according to Section XXV (Bi-annual Reports) of this Decree, the identification of all interconnections found in the last six (6) months, a description of the specific interconnection found including its location, the approximate flow and extent of the discharge (if known) caused by the interconnection and the community and any waterbodies affected by the interconnection. PRASA shall also report in the appropriate Bi-annual Report on its plans to remedy the interconnections found.

b.    PRASA shall eliminate any interconnection found within one (1) calendar year of the date PRASA first became aware of the interconnection.  If PRASA anticipates that the interconnection cannot be resolved within one (1) year, PRASA shall submit information to EPA explaining why eliminating the interconnection will require more time, identifying other entities (if applicable) involved in eliminating the interconnection, and the plans to address the interconnection.  PRASA shall submit the information explaining why the interconnection cannot be eliminated within one (1) year in the appropriate Bi-annual Report.

24.    Sewer Cleaning Element.  As part of the S2OMP being submitted to EPA for review and approval referred to above, PRASA shall include a Sewer Cleaning element to address the minimum requirements of the S2OMP as set forth in Appendix G.  Data obtained

from the Sewer System Reconnaissance efforts shall be used to establish Sewer System

cleaning and re-inspection frequencies for the entire Puerto Nuevo RWWTP Sewer System.

For purposes of this Section of the Consent Decree, Cleaning is defined as removal from the

Puerto Nuevo RWWTP Sewer System of FOG, debris, solids, sand, roots and/or any other

obstructions that have caused or contributed to previous SSOs, DWOs or Unauthorized

Releases, and/or that are likely to cause or contribute to the future occurrence of SSOs, DWOs

or Unauthorized Releases.

      25.    EPA and PRASA identified specific areas on the map attached to this Decree as

Appendix L (Map of Priority Areas) to commence efforts for Sewer Cleaning and Sewer

System Reconnaissance in the Puerto Nuevo RWWTP.  The areas depicted on Appendix L

(Map of Priority Areas) were identified by EPA and PRASA as the highest priority areas based

on the proximity to waterways, condition of the waterways affected, incidence of SSOs and

Unauthorized Releases, and the effect of SSOs or Unauthorized Releases on nearby residents

and the location of CSO outfalls. Sewer System Reconnaissance of all sewer pipes including

the trunk sewers pipes of Miramar, Old San Juan and Hato Rey (San José) located in the areas

depicted on the map attached as Appendix L (Map of Priority Areas) to this Decree, and

cleaning of less than 30 inch sewer pipes in said areas shall be completed no later than three (3)

years from the Date of Lodging.  However, if during the Sewer System Reconnaissance and

Cleaning of the areas identified on Appendix L (Map of Priority Areas), it is determined that

any sewer of the Puerto Nuevo RWWTP Sewer System with a diameter of greater than thirty

(30) inches is the cause of SSOs in the areas identified on Appendix L, PRASA shall modify

its Sewer System Reconnaissance and Cleaning schedule to include cleaning of such sewer

pipes with a diameter of greater than thirty (30) inches or sections thereof.  PRASA has

acquired and shall operate at least two (2) flush/vacuum trucks solely dedicated to providing

preventive sewer maintenance to assist PRASA in cleaning the sewers, which is an integral

part of the Sewer Cleaning and Sewer System Reconnaissance Element of the S2OMP;

26.    a. No later than six (6) months prior to concluding the Sewer System

Reconnaissance and Sewer Cleaning of the area referenced to above in Paragraphs 23 - 25,

PRASA shall submit to EPA for review and approval a schedule for completing the Sewer

System Reconnaissance and Sewer Cleaning of the remaining PRASA sewers hydraulically

connected to the Puerto Nuevo RWWTP Sewer System.  These submissions to EPA by

PRASA shall include all information necessary to determine an appropriate schedule to

implement the Sewer System Reconnaissance and Sewer Cleaning elements of the S2OMP for

the entire Puerto Nuevo RWWTP Sewer System, and shall ensure that PRASA completes the

Sewer System Reconnaissance and Sewer Cleaning of all the sewers hydraulically connected

to the Puerto Nuevo RWWTP Sewer System.

b.    PRASA shall undertake operation and maintenance efforts of the Puerto Nuevo

RWWTP Sewer System in accordance with its Permit requirements prior to the

implementation of the S2OMP.

27.    PRASA shall collect and retain information concerning the general conditions

of the pipes, manholes and joints, including but not limited to blockages found; cracked,

broken or ruptured pipes; and the diameter and materials of the pipes.  PRASA shall provide in

each Bi-annual Report submitted pursuant to Section XXV (Bi-annual Reports) a description

of all of the sewer defects found during prior six (6) month period during the Sewer System

Reconnaissance that hinder the operation of the Sewer System.  Any defects found during

Sewer System Reconnaissance that hinder operation of the Sewer System requiring repair or

replacement shall be corrected within one year of identifying the defect.  If PRASA does not correct the defect within one year of identification of the defect, PRASA shall provide to EPA an explanation of why the repair or replacement will not be conducted within that one year period.  If EPA approves and accepts the explanation, PRASA shall include the project in its Prioritization System to ensure that the defect is addressed by PRASA in accordance with the Prioritization System.  If EPA does not agree with PRASA's explanation or description of why the repair or replacement will not be conducted within one year, EPA and PRASA shall meet within thirty (30) days of EPA's notification to discuss the appropriate schedule for such repairs or replacements to be undertaken.  EPA's decision regarding the schedule for repairs or replacements shall control, and is not subject to dispute resolution under Section XXXI (Dispute Resolution) of this Decree.

28.    No later than three (3) years from the Date of Lodging, PRASA shall begin reporting the amount(s) of wet weather and dry weather discharge from CSO Outfalls including estimated flow as PRASA has asserted it does not have the capability to estimate flow as of the Date of Lodging.  If PRASA determines that such reporting is not feasible by this date for any of the CSO Outfalls, PRASA shall no later than three (3) years from the Date of Lodging explain to EPA in a written submission why such reporting is not feasible for any portions of the Puerto Nuevo RWWTP Sewer System, as applicable, and provide to EPA the date(s) when such reporting shall be available for the all of the CSO Outfalls.

29.    Fats, Oil and Grease (FOG) Control Element.   As part of the S2OMP being submitted to EPA for review and approval, PRASA shall revise its current FOG Control Program no later than June 30, 2016, to address at a minimum the requirements set forth in Appendix M  (Minimum Requirements To Develop a FOG Control Program).  The revised

FOG Control Program shall be implemented as part of the S2OMP.  The FOG Control element shall include a schedule for the development and enforcement of grease control measures to assure that grease accumulations are not restricting the capacity of the Sewer System causing or contributing to SSOs, Unauthorized Releases and/or CSOs.

30.    <u>Sanitary Sewer Overflows (SSOs), DWOs and Unauthorized Release Prevention and Control Element</u>.  The S2OMP submitted to EPA for review and approval shall include a Prevention and Control Element for responding to and eliminating SSOs, DWOs and Unauthorized Releases from the Puerto Nuevo RWWTP Sewer System.  This element shall include the following actions:

a.    If an overflow occurs at a CSO Outfall specified in the NPDES Permit, it will be reported as required in the Puerto Nuevo RWWTP Permit. Any DWOs shall also be reported to EPA within twenty four (24) hours of discovery to the following EPA SharePoint Site entitled "Puerto Nuevo RWWTP Notification."   Such reporting shall use the form attached in Appendix N (EPA Reporting Form) to this Decree, or a similar form approved by EPA, no later than October 31, 2015, and shall specify the waterbody impacted by the DWO.

b.    If an SSO, CSO and/or Unauthorized Release occurs in the Puerto Nuevo RWWTP Sewer System, PRASA shall respond in accordance with the EPA approved SRCP.

c.    If a location requires recurrent, programmed and specific actions or the development of a project to eliminate the occurrence of an SSO(s), DWO(s) and/or Unauthorized Release(s) occurring in that location, such location shall be tracked and addressed as part of the Areas of Concern Section (Section XII) of this Consent Decree.

d.   Where an SSO or Unauthorized Release has occurred and discharges to the waters of the United States, PRASA shall submit notification in the form attached as Appendix

N (EPA Reporting Form), or a similar form approved by EPA, to the following EPA Share Point Site entitled "Puerto Nuevo RWWTP Notification."   Such notification shall begin no later than October 31, 2015, and identify the location of the SSO or Unauthorized Release (including the physical location and coordinates), the cause of the discharge, waterbody affected, pipe diameter and all action(s) taken to resolve the SSO or Unauthorized Release, as well as any other information regarding the SSO or Unauthorized Release that PRASA determines is necessary to fully understand the nature of the SSO or Unauthorized Release.  No later than September 30, 2018, PRASA shall also identify the approximate flow of the SSO or Unauthorized Release on the EPA Reporting Form or a similar form approved by EPA.  This notification shall be sent to EPA at the above-identified SharePoint Site within twenty-four hours of discovery of the discharge to a water of the United States.

e.    PRASA shall report to EPA in its Bi-annual Report submitted pursuant to Section XXV (Bi-Annual Reports) of this Decree the following information:  the location (including physical address and coordinates) of all SSO(s), DWO(s) and/or Unauthorized Release(s) within the last six months, the date(s) of correction(s) within the service area, and any SSO, DWO or Unauthorized Release that has not been corrected within the last six (6) month period and the reasons such SSO, DWO or Unauthorized Release has not been corrected within this six (6) month period.

31.   <u>Puerto Nuevo RWWTP Sewer System Condition Assessment Program</u>.  Within sixty (60) days of completing the Sewer System Reconnaissance of the Sewer System hydraulically connected to the Puerto Nuevo RWWTP, PRASA shall submit to EPA for review and approval its proposed plan to undertake the Condition Assessment of the Sewer System hydraulically connected to the Puerto Nuevo RWWTP.  The plan submitted for EPA review

and approval shall include the proposed schedule for the Condition Assessment.  For purposes

of this Decree, Condition Assessment shall mean the basic assessment of the condition of the

Sewer System to measure the type, severity and extent of deterioration the Sewer System is

experiencing.  No later than 90 days after the completion of the Condition Assessment,

PRASA shall submit to EPA for review and approval a report explaining the findings of the

Condition Assessment of the Puerto Nuevo RWWTP Sewer System (hereinafter referred to as

the "Condition Assessment Report").  The Condition Assessment Report shall include a

schedule for repairs to be completed, or provide for inclusion of remedial measures in the

Prioritization System, as appropriate.

## X.       CAÑO MARTÍN PEÑA PROJECTS

32.    PRASA shall undertake the sewer and aqueduct projects identified below and

described in Appendix O (Description of Caño Martín Peña Projects).  These projects are

contingent upon the completion of related prerequisite projects to be developed by parties not

affiliated with PRASA as explained in Appendix O (Description of Caño Martín Peña

Projects).   The projects required include:

a.    New Rexach Trunk Sewer Siphon,

b.    North Israel and Bitumul Sanitary Sewer System,

c.    South Israel and Bitumul Sanitary Sewer System,

d.    Las Monjas and Buena Vista Sanitary Sewer System, and

e.    Buena Vista and San Ciprián Sanitary Sewer System.

33.     The projects identified above are located within the Caño Martin Peña area and

are expected to cost approximately one hundred twenty million dollars ($120,000,000.00) to

complete.  PRASA shall provide in every other Bi-annual Report on the status of the implementation of each of these projects.

XI.        **PUERTO NUEVO RWWTP SEWER SYSTEM EVALUATIONS AND REPAIRS**

34.   <u>Barriada Figueroa Sewer Inventory and Mapping Project</u>:  No later than December 1, 2016, PRASA shall complete the sewer inventory and mapping of the Barriada Figueroa Sewer area (hereinafter referred to as the "Barriada Figueroa Project") as depicted in the map attached hereto as Appendix P.  At a minimum, the Barriada Figueroa Project shall include the identification and description of all sewer structures, including, but not limited to the following:  manhole structures, sanitary sewer pipes, and illegal discharges and interconnections found within the Barriada Figueroa area.  PRASA shall also include in the Barriada Figueroa Project any information concerning storm sewers and stormwater catch basins identified during field reconnaissance with the understanding that PRASA does not have access to all the storm sewers and catch basins owned and/or operated by the Municipality of San Juan or another third party.

a.    No later than February 1, 2017, PRASA shall submit to EPA for review and approval a Barriada Figueroa Sewer Investigation and Mapping Report including the findings of the Barriada Figueroa Project concerning PRASA's Sewer System.  Such Report shall be completed in accordance with the requirements of Appendix Q (Barriado Figueroa Project Report Minimum Requirements).

b.    No later than August 1, 2017, PRASA shall submit to EPA for review and approval an Engineering Design Project Report for the Barriada Figueroa area to correct the deficiencies found in the Barriada Figueroa Project.  The engineering design project shall aim

to eliminate any interconnections found from PRASA's Sewer System to storm pipes and shall provide the necessary Sewer System improvements and repairs.  The Engineering Design Project Report shall include, but is not limited to: proposed actions to repair, replace and/or construct sanitary manholes, sanitary sewer pipes, sanitary pump stations and any other construction necessary to properly operate and maintain the Sewer Systems including a schedule for all proposed actions.  The Engineering Design Project Report shall also identify all interconnections found from PRASA's Sewer System to storm pipes and/or structures during the Barriada Figueroa Project, and indicate which have been eliminated and plans to eliminate the remaining interconnections.

35.   <u>Sewer System and Maps</u>.  PRASA shall submit to EPA revised electronic maps of its Puerto Nuevo RWWTP Sewer System in GIS format on an annual basis along with the second Bi-annual Report submitted according to Section XXV (Bi-annual Reports) of this Decree for each calendar year.

**XII.       SPECIFIC REQUIREMENTS FOR THE AREAS OF CONCERN  IN THE PUERTO NUEVO REGIONAL WWTP SEWER SYSTEM**

36.   <u>Areas of Concern in Puerto Nuevo Area</u>:

a.   In order to minimize the occurrence of CSOs and work toward the elimination of SSOs and Unauthorized Releases, EPA has identified specific Areas of Concern within the Puerto Nuevo RWWTP Sewer System that require interim measures to be taken while the Sewer System is being assessed and repaired.  The specific Areas of Concern that EPA and PRASA are aware of as of the Date of Lodging are identified in Appendix R (Puerto Nuevo RWWTP Sewer System Areas of Concern) attached to this Decree.  Appendix R also indicates the actions that PRASA shall undertake in each identified Area of Concern.

b.    As of the Date of Lodging this Decree, PRASA shall undertake the actions identified in Appendix R (Puerto Nuevo RWWTP Sewer System Areas of Concern) for each Area of Concern according to the deadlines identified in Appendix R.  PRASA shall submit to EPA the actions taken to the following EPA SharePoint Site entitled "Puerto Nuevo RWWTP Notification" within two (2) working days upon completion of each action required by Appendix R.

c.    Removing/Adding to Areas of Concern locations and remedial actions: PRASA may request in writing that EPA remove a particular Area of Concern identified in Appendix R (Puerto Nuevo RWWTP Sewer System Areas of Concern).  PRASA may request removal after it has certified to EPA that all of the remedial actions necessary in that particular area have been completed, and no SSOs or Unauthorized Releases  have occurred in that particular area in the last twelve (12) months.  A location may be considered an Area of Concern by analyzing the following conditions: frequency of SSOs/Unauthorized Releases/DWOs; health/safety effects on the residents of sewage overflows; environmental impacts to water body of sewage overflows; and complexity of the actions needed to resolve the issue.  EPA or PRASA may add other locations based on the criteria identified above and specific actions necessary to address the SSOs, Unauthorized Releases or DWOs.  EPA may require other interim actions to any of the Areas of Concern as it deems necessary to achieve the goals of the Clean Water Act.

d.    The S2OMP submitted to EPA for review and approval under Section IX (Sewer System Operation and Maintenance Program and Condition Assessment Program with Respect to the Puerto Nuevo Regional Wastewater Treatment Plant Sewer System) of this Decree may include a section to address the Area of Concerns requirements in this Consent Decree as part of the S2OMP.  All requirements of this Areas of Concern Section shall be

addressed in the S2OMP if PRASA elects to manage the identified and any future Areas of Concern under its S2OMP.   Nevertheless, all requirements of this Section pertaining to the Areas of Concern shall be undertaken by PRASA in accordance with the requirements of this Section and Appendix R (Puerto Nuevo RWWTP Sewer System Areas of Concern).

      e.    <u>Reporting Actions to Address Areas of Concern</u>.  PRASA shall report to EPA on the status and plan for addressing each Area of Concern in the Bi-annual Report to be submitted pursuant to Section XXV (Bi-annual Reports) of this Decree.  Such report shall include any new Areas of Concern identified pursuant to sub-paragraph 36c.

### XIII.         MODIFICATION/PRIORITIZATION OF REMEDIAL MEASURES

      37.    Unless otherwise provided in this Consent Decree, PRASA may request in writing that EPA grant an extension of any deadline established in Appendices H (Base List of Remedial Measures to address Washwater Discharges at WTPs),  J (Base List of Remedial Measures for WWTPs), and I (Capital Projects Subject to Prioritization) provided that PRASA request the extension no less than sixty (60) days in advance of the deadline for which the extension request is made.  EPA may grant the request in writing to PRASA if it determines that the request was timely, good faith efforts to comply with the remedial measures and the timetables identified in Appendices H - J have been made, and good cause for the requested extension exists.  The granting of an extension of time pursuant to this Paragraph shall be within EPA's sole discretion and is not subject to Dispute Resolution as provided for in Section XXXI (Dispute Resolution) of this Consent Decree.  The granting of an extension request shall not necessarily be deemed a material modification within Section XXXVII (Modification) of this Consent Decree.

38.   PRASA may substitute different control technology or equipment units or processes for the projects listed in Appendices H (Base List of Remedial Measures to address Washwater at WTPs), I (Base List of Remedial Measures for WWTPs), and J (Additional Remedial Measures for WTPs and WWTPs) with written notice to EPA prior to the implementation of the substitution, and provided that such control technology or equipment units or processes achieve the same or better results.  However, the effectiveness of any control technology is not warranted or endorsed in any way by EPA.  The substitution of technology/equipment pursuant to this Paragraph shall not be deemed a material modification within the meaning of this section of this Consent Decree as long as the project(s) completed according to the deadline set forth in Appendices I (Base List of Remedial Measures for WWTPs), J (Capital Projects Subject to Prioritization), and H (Base List of Remedial Measures to address Washwater Discharges at WTPs).  PRASA's decision to substitute control technology or equipment units or processes does not alter, or provide a reason to alter, the deadlines in Appendices I, J or H.

39.   PRASA is utilizing and will continue to utilize its Prioritization System to plan its expenditures of capital improvement projects to meet PRASA's CWA and SDWA compliance obligations and any requirements of this Consent Decree.

40.   PRASA shall input in its Prioritization System no later than August 31,  2016, and on a bi-annual basis after that date, as appropriate, when any of the following occur:

a.   PRASA experiences and documents any significant financial changes that affect PRASA's ability to meet the deadlines in Appendix I (Capital Projects Subject to Prioritization).  Any significant financial change documented by PRASA shall be consistent with EPA's Financial Capability Assessment Framework for Municipal Clean Water Act

Requirements, dated November 24, 2014

(http://water.epa.gov/polwaste/npdes/cso/upload/municipal_fca_framework.pdf);

     b.   New CWA or SDWA obligations resulting from newly promulgated regulations and/or applicable permits; or

     c.   Any remedial work PRASA determines needs to be implemented if it either: (i) directly relates to PRASA ultimately achieving compliance with the CWA, (ii) directly relates to PRASA ultimately achieving compliance with the SDWA, or (iii) directly relates to PRASA meeting the requirements of this Consent Decree.  The remedial work in this sub-paragraph shall only be included in the Prioritization System if it requires a significant financial cost to complete.

     41.   Notwithstanding the requirements of Paragraph 40 above, at any time EPA may, in its sole and unreviewable discretion and not subject to dispute resolution pursuant to Section XXII (Penalties) of this Consent Decree, identify projects that will entail significant financial costs to undertake for inclusion in the Prioritization System that directly relates to PRASA achieving compliance with the CWA or this Consent Decree.  If requested by PRASA, EPA and PRASA agree to meet and confer within thirty (30) Days of receiving EPA's written notification to include such project in the Prioritization System.

     42.   After PRASA completes its run of the Prioritization System as provided for in this Section, and to the extent the Prioritization System indicates that any changes to Appendix I (Capital Projects Subject to Prioritization) of this Decree, or the Decree with PRDOH, are necessary, PRASA shall report (hereinafter referred to as the "Prioritization Report") to EPA and PRDOH the results of the Prioritization System analysis within fifteen (15) days of completing its analysis under the Prioritization System.  The Prioritization Report  submitted to

EPA and PRDOH for their review and approval shall include but not be limited to the following information:  1) explaining the significant financial change (including but not limited to all financial documents and relevant correspondence explaining the significant financial change); 2) identifying the specific environmental obligation including the proposed scope of work (including any necessary studies) to address the environmental obligation and the projected costs (to the extent known) associated with the environmental obligation; 3) the impact of the environmental obligation on the population served and/or affected; 4) other items specifically identified to be considered in the Prioritization System; and 5) any additional information EPA requires in order for EPA to consider any changes under this Decree that the Prioritization System deems necessary.  If no new significant financial changes and/or no new CWA or SDWA compliance obligations have arisen since the last Prioritization System was run and approved by EPA, PRASA is not required to run the Prioritization System and report to EPA and PRDOH. PRASA shall report to EPA in its appropriate Bi-annual Report if it is not running the Prioritization Report for the reasons stated above.

43.    PRASA has an ongoing obligation until Termination of this Decree to submit a Prioritization Report to EPA and PRDOH within fifteen (15) days of completing its analysis under the Prioritization System consistent with the terms of this Section of this Consent Decree.

44.    EPA and PRASA agree to meet and confer within thirty (30) Days of EPA receiving the Prioritization Report.  As appropriate, EPA and PRASA may invite PRDOH to attend these meetings to discuss the various environmental obligations discussed in the Prioritization Report.

45.    PRASA shall provide to EPA the following financial information no later than August 31, 2016, and annually each year thereafter: projected budget for next fiscal year, debt service coverage ratio, senior lien coverage ratio, liquidity, any approved future rate increases, status of debt to plant ratio, key financial ratios monitored internally and for lender(s), current bond ratio and current bond ratings, number of customers by service pipe, and other financial information requested by EPA.  PRASA shall also submit its most recent annual financial report, bond prospectus issued during prior year and any rating agency report received during the previous year. In addition to financial reporting requirements, PRASA shall provide notice to EPA consistent with Section XXVIII (Notices) of this Decree, of any change in bond rating status within twenty (20) days of any such change.  For purposes of this Section of the Consent Decree, significant financial cost means the cost to complete a specific remedial measure of no less than one million dollars ($1,000,000.00).

46.    The United States and PRASA anticipate that utilizing the Prioritization System will likely require modification of some of the remedial measures listed in Appendix I (Capital Projects Subject to Prioritization).  Any material modification of the remedial measures shall be consistent with the procedures identified in Section XXXVII (Modification).

**XIV.        INTERIM EFFLUENT LIMITS FOR WTPS and WWTPS**

47.    Commencing from the Date of Lodging, and continuing until the established deadlines for each WWTP listed in Appendix S (Interim Effluent Limits for WWTPs)  and each WTP listed in Appendix T (Interim Effluent Limits for WTPs), PRASA shall comply with the respective interim limitations set forth for each of the WWTPs and WTPs listed in Appendices S and T. For each pollutant for which an interim limit is established in Appendix S with respect to the WWTPs, and Appendix T with respect to the WTPs, PRASA shall monitor

for compliance with the same measurement frequency and sample type as specified for that pollutant in the respective NPDES Permit for each WWTP and WTP, and shall submit the results of each sample on the monthly Discharge Monitoring Reports (DMRs) submitted for each WWTP and WTP in accordance with its respective NPDES Permit.

48.     During the period that the interim effluent limitations are in effect for those WWTPs and WTPs with NPDES Permits, PRASA shall comply at all times with all other conditions and limitations set forth in the NPDES Permit for each WWTP and WTP.

49.     Once the time frame for interim limits set forth in Appendices S (Interim Effluent Limits for WWTPs) and T (Interim Effluent Limits for WTPs) expire, PRASA must comply with all terms, conditions and limitations set forth in each individual NPDES Permit for each WWTP or WTP.  However, PRASA may request from EPA an extension of its interim limits only if it still cannot comply with the effluent limitations set forth in its NPDES Permit or a NPDES Permit has not yet been issued provided that PRASA has:

a.     complied with all remedial measures;

b.     implemented the IPMP and continues to implement the IPMP as amended, if applicable; and

c.     submitted necessary information to Puerto Rico's Environmental Quality Board for the Water Quality Certificate for the affected WTP or WWTP; and applied to EPA for a NPDES Permit or modifications to its NPDES Permit.

50.     The request must specify what measures have been taken by PRASA to comply with its Permit and/or to receive a modification to its Water Quality Certificate or NPDES Permit, and an explanation of the amount of time needed for the extension of the interim limits. EPA's determination regarding whether or not the interim limits are extended is in EPA's

unreviewable discretion and shall not be subject to the provisions of Section XXXI (Dispute Resolution).

51.     In the event new or revised NPDES Permit effluent or water quality standards limitations arise that require modification of treatment facilities at PRASA WWTPs and WTPs, interim limits shall be developed and implemented as set forth herein for the time period required to complete the remedial measures necessary. If STSs of the WTPs Almirante Sur, Frontón, and Hogares Seguros referred to in Paragraph 66 are issued a NPDES subsequent to the Date of Lodging, PRASA may request form EPA specific interim limits between twelve (12) to fifteen (15) months after the effective date of each NPDES Permit.

## XV.        INTEGRATED MAINTENANCE PROGRAM

52.     All WTP STSs, WWTPs and Pump Stations under this Consent Decree shall be operated and maintained in accordance with the EPA-approved Integrated Preventative Maintenance Program presently known as the Integrated Maintenance Program ("IMP"). PRASA shall continue to implement the EPA approved IMP, which meets the minimum requirements set forth in Appendix U (Minimum Requirements of the Integrated Maintenance Program) of this Consent Decree.

53.     PRASA may submit to EPA for review and approval a request for modification of the IMP.  Any modifications to the IMP made pursuant to this Paragraph shall not be deemed a material modification within the meaning of Section XXXVII (Modification) of this Consent Decree.

54.     No later than March 1, 2017, PRASA shall develop and submit to EPA for review and approval a Corrosion Control Program to add to the implementation of the IMP.

The Corrosion Control Program shall address the minimum requirements set forth in Appendix V (Minimum Requirements for Corrosion Control Program), attached to this Decree.

55.     Stipulated penalties shall be assessed for the failure to implement any of the minimum requirements of the IMP as set forth in Appendix U (Minimum Requirements for Development of the IMP) of this Consent Decree.  PRASA may also be assessed for failure to implement other components of the IMP if EPA, in its discretion, determines that such failure is hindering PRASA's compliance with this Consent Decree and/or the terms and conditions of each individual Facility's NPDES Permits.  Such penalties for failure to implement the IMP shall be assessed in accordance with the provisions of Section XXII (Penalties).  Nothing herein shall prohibit the simultaneous accrual of stipulated penalties for separate violations of the IMP.

## XVI.        TRAINING AND ADDITIONAL REQUIREMENTS FOR OPERATORS

56.     All new STS or WWTP operators hired by PRASA must be trained in monitoring, recording and reporting requirements of the individual NPDES Permits as applicable within six (6) months of the commencement of employment as an operator. Following said six (6) months of the commencement of employment of any new STS or WWTP operator, PRASA shall certify in the appropriate Bi-annual Report that the training required under this Paragraph has been completed.

57.     PRASA shall also submit to EPA for review and approval a training program no later than 180 days from the Date of Lodging that provides for periodic training to all STS and WWTP operators in monitoring, recording and reporting requirements of the individual NPDES Permits and requirements of this Decree.  Such training program shall include any requirements of this Decree that affect the STS and WWTP operators' responsibilities, and

shall consider any new requirements that have arisen since the last training was performed, the time that has passed since the majority of operators have been trained, and set forth a proposed schedule to provide training to these operators.

58.   All PRASA WWTPs and WTPs shall have a Commonwealth licensed operator available at all times to ensure proper operation of the treatment facilities in accordance with Law 53 of July 13, 1978.  All new operators at WWTPs and WTPs hired after the Date of Entry of this Decree shall obtain a Commonwealth license within twenty-four (24) months of the operator's start date.

## XVII.      CONTINUED IMPLEMENTATION OF A PROCESS CONTROL SYSTEM

59.   PRASA has implemented a Process Control System ("PCS") at all of PRASA's STSs and WWTPs.  PRASA shall continue to implement the PCS in accordance with potable water and wastewater industry standards which includes, but shall not  be limited, to the following items:

a.   Process Control Manual with Procedures and Guidance for all processes related to the treatment of Washwaters at the STSs and wastewater at the WWTPs;

b.   Accurate measurements of flow, its chemical, physical and biological characteristics and mass balances;

c.   Logs and records for all activities, processes and tests performed at the STSs and WWTPs;

d.   Tests for upper and lower plant operational parameters for all WWTPs where applicable such as: chemical oxygen demand (COD), biochemical oxygen demand (BOD), turbidity, dissolved oxygen (DO), temperature, total residual chlorine (TRC), jar tests for

polymer selection, polymer application rates, disinfection application rate, filter backwash required frequency (only for tertiary WWTPs), organic loading, sludge age, clarifier loading rates, clarifier sludge blanket, Mixed Liquor Volatile Suspended Solids (MLVSS), Food/Mass (F/M) Ratio, Mean Cell Residence Time (MCRT), flow, return sludge (recirculation rates), Sludge Volume Index (SVI), biomass air requirements, recirculation patterns, sludge settleability (settleable solids), sludge reduction volume, chemical dosages for stabilization, total phosphorus, centrifuge test and microscopic analysis;

e.   Tests for upper and lower plant operational parameters for all STSs where applicable such as: turbidity, dissolved oxygen, temperature, total residual chlorine, polymer application rates, disinfectants application rate, flow, thickener sludge depths, settleable solids;

f.   Trouble-shooting guides to keep process for proper process parameters within recommended industry values where required;

g.   Organizational structure for implementation of PCS including the identification of personnel responsible for PCS implementation including technical support and laboratory feedback;

h.   Calculations for optimizing performance;

i.   A process management plan which estimates treatment goals based on applicable permit requirements for each WWTP and STS; and

j.   Continuous monitoring of equipment already installed (i.e. flow meters, gauges), including proper calibration as required by the NPDES Permit, to ensure a proper operational condition.

60.   PRASA shall identify for each STS and WWTP (including any STS or WWTP that begins operation after the Date of Lodging), and update as appropriate, all personnel

responsible for implementation of PCS, including technical support and laboratory feedback in the appropriate Bi-annual Report(s).  All personnel responsible for implementation of PCS, which shall at a minimum include operators and their respective supervisors, shall receive annual training including refresher courses as deemed appropriate by EPA and PRASA.

61.    PRASA's PCS Plan(s) shall be periodically updated and revised to address, as appropriate, new regulations, treatment process changes, new equipment and/or treatment units installed/eliminated, and addition/elimination of chemicals (e.g., polymers, etc.).  For all new STSs and WWTPs commencing operation after entry of this Decree, the PCS shall be established and in full operation within six (6) months of the start of operation of the STS or the WWTP.

## XVIII.        SPILL RESPONSE AND CLEANUP PLAN

62.    PRASA has implemented and shall continue to implement a Spill Response and Cleanup Plan ("SRCP") that specifies actions to be taken by PRASA to address SSOs, Unauthorized Releases and CSOs from all Facilities.  For this Section of the Decree, Facilities shall also include all Sewer Systems owned and/or operated by PRASA, irrespective of whether such Sewer Systems are otherwise covered by this Decree.

63.    Under the SRCP, PRASA shall utilize the form attached as Appendix N (EPA Reporting Form) to the Decree, or a similar form as approved by EPA, to report every Unauthorized Release and SSO that occurs from a point not authorized by a NPDES Permit. Reporting using the form attached as Appendix N shall begin no later than October 31, 2015. EPA shall notify PRASA of the applicable Share Point Site to submit the EPA Reporting Form.

64.     PRASA shall be responsible for familiarizing the responsible officials and appropriate employees with the terms of the SRCP, and in the event of PRASA's failure to implement the SRCP PRASA shall not raise as a defense its failure to inform the responsible officials and appropriate employees.

65.     PRASA shall submit an updated SRCP in accordance with the requirements of Appendix W (Minimum Requirements for SRCP) for EPA review and approval no later than October 31, 2015, and shall submit updates on that date annually thereafter as necessary.  Each update of the SRCP shall be submitted to EPA for review and changes to the SRCP shall be incorporated into and become enforceable under this Decree.  Any proposed amendments to the SRCP that are identified as critical with respect to the proper operations of the Facilities and the Sewer System shall be submitted by PRASA to EPA for review and approval.  Any dispute with respect to any portion of the SRCP or amendments to the SRCP shall not delay the development or implementation of the undisputed portions of the SRCP, to the extent feasible.

## XIX.     MONITORING, RECORDS AND REPORTING REQUIREMENTS FOR UNPERMITTED STS

66.     For any existing STS that does not have an effective NPDES Permit, or upon the start of operation of any new STS at a WTP that does not have a final NPDES Permit, PRASA shall sample monthly the discharge for the following parameters:  BOD, Color, Copper, Fluoride, Temperature, Total Ammonia, Total Dissolved Solids, Total Phosphorous, Lead, Zinc and Turbidity.  The discharge shall also be sampled and analyzed daily for the following parameters:  Dissolved Oxygen, Flow, pH, Temperature, Turbidity and Total Residual Chlorine.  All monthly and daily samples shall be grab samples, except for BOD and flow.  BOD samples shall be composite and flow recorded daily.  The monitoring of this

discharge shall continue until such time as a final NPDES Permit is issued for the WTP at which time the WTP shall comply with the requirements of the respective NPDES Permit. The results of this monthly and daily monitoring shall be reported to EPA in the Bi-annual Progress Report. The STSs that currently have a completed NPDES Permit application pending and have not received a NPDES Permit are: Almirante Sur, Frontón, and Hogares Seguros.

## XX.      WASTEWATER TREATMENT CAPACITY AND FLOW MANAGEMENT

67.     PRASA's Existing Sewer Connection Policy. The United States and PRASA mutually agree that an effective system for managing wastewater treatment capacity is essential for protecting the environment while also allowing economic growth and development on Puerto Rico. PRASA shall continue to implement its sewer connections policy as set forth below:

a.     Evaluate whether there is adequate treatment capacity at a wastewater treatment plant to accommodate additional flows from a proposed development project based on a capacity management tool of PRASA's Public and Private Projects Office (PPP) database.

b.     Automatic Sewer Ban

  i.   If any WWTP exceeds one hundred five percent (105%) of its Monthly Average Permitted Flow as defined in its NPDES Permit for three (3) consecutive months or is predicted to exceed one hundred five percent (105%) based on flows that have been approved but not yet connected, PRASA shall immediately impose a ban on any applications for new sewer connections to such WWTP. The ban on new sewer connection includes any new flows that are added, connected, or transported (by any means) into the service area of a PRASA WWTP, which flows are intended to be treated by that PRASA WWTP. For those WWTPs that do not have a Monthly Average Permitted Flow to be used in this Paragraph, is the Monthly Average Permitted Flow as set forth in Appendix X (Monthly Average Permitted Flow).

  ii.  Any flows, either existing or anticipated, which PRASA has already

approved but which have not yet been connected or accepted at the WWTP shall be allowed provided that the predicted Monthly Average Permitted Flow will not exceed one hundred five percent (105%).

c.      If PRASA has applied for an increase in the permitted treatment capacity of a WWTP and EPA concludes that there is a reasonable probability that it may be granted, and if said WWTP is in regular compliance with the effluent limitations of its NPDES Permit, other than permitted flow, PRASA may continue to grant applications for  new sewer connections while the application for an increase in permitted capacity is pending but not acted upon as long as the WWTP remains in regular compliance with the effluent limitations of its NPDES Permit, other than permitted flow.

d.      If an applicant provides an offset in the amount of 110% of the amount this new connection will increase the demand for capacity if PRASA were to approve the application, PRASA may nonetheless grant the application for new sewer connections, conditioned on the actual performance of the offsets in an amount no less than 110% of the increase in capacity attributable to the application. (For example, if an applicant applies for a new sewer connection that would add 10,000 gallons per day, the applicant must offset this increase with a reduction of 11, 000 gallons per day). The 110% offset may consist either of (1) an increase in the WWTP's treatment capacity to be completed prior to the approved flows being connected to or accepted at the WWTP, and/or (2) verifiable demand reductions (such as replacement of existing flow-generating equipment with more efficient equipment, or reduction of infiltration flows as by repair of sewer pipelines).

e.      Any automatic sewer connection ban imposed shall be lifted once PRASA submits to EPA documentation certifying that the average monthly flow to the WWTP is less

than 100% of the Monthly Average Permitted Flow for a period of two (2) consecutive months.

68.   <u>Notice of Changes.</u>   In the event that PRASA proposes to change in any material respect the above described sewer connection policy PRASA shall provide sixty (60) days written notice of the proposed changes to EPA.  If EPA within sixty (60) days of receiving notice objects in writing to any of the proposed changes on the grounds that the changes would violate the purposes of this Consent Decree, the changes objected to shall be temporarily held in abeyance and shall not go into effect while the United States and PRASA pursue Dispute Resolution under Section XXII (Penalties) of this Consent Decree.

69.   <u>Notice of Deficiency.</u>   In the event that EPA believes that the implementation of the sewer connection policy by PRASA is not effective at managing treatment capacity at one or more WWTPs, EPA shall provide written notice to PRASA of a deficiency, including a statement of EPA's reasons for believing that the PRASA's policies or implementation are not effectively managing WWTP capacity.  EPA and PRASA agree to meet informally within thirty (30) days to discuss changes to policies or implementation to cure the deficiencies.  If they are unable to agree on changes to policies or implementation to address the deficiencies, either Party may invoke Dispute Resolution under Section XXXI (Dispute Resolution) of this Consent Decree.

70.   <u>Flow Meter Devices.</u>   PRASA shall ensure that all WWTPs have flow meter devices installed and in operation.  For purposes of this Section, the term Flow Meters shall be defined as equipment that captures and records the effluent wastewater flow for all WWTPs and for every discharge point indicated in the applicable NPDES Permit.  The term Flow Meter Device under this Section also includes the installation and use of flow totalizers to capture

amount of flow discharged within a twenty four (24) hour period for WWTPs that discharge effluent intermittently.

72.    The flow meter devices at WWTPs shall be used with methods to measure flow that is consistent with the accepted scientific and industry practices to ensure the accuracy and reliability of measurements of effluent wastewater flow for WWTPs.  The flow meter devices shall be capable of measuring flow with maximum deviation of plus or minus 10 percent. Calibration records for any of the flow meter devices shall be kept for at least three (3) years from the date the last calibration was performed.  A label indicating current and future dates of calibration, and signed by the calibration technician must be affixed to the flow metering device.  The sampling point for the discharge shall be located in the area immediately after the installed flow meter device, unless otherwise specified in the applicable NPDES Permit.

## XXI.      <u>REVIEW AND APPROVAL PROCEDURES</u>

72.    Unless indicated otherwise in this Consent Decree, the following review and approval procedures set forth in this Section shall apply with respect to any plan, program or other document which is required to be submitted for EPA approval pursuant to this Consent Decree:

a.    After receipt and review of any plan, program or other document which is required to be submitted for approval pursuant to this Consent Decree, EPA may (1) approve the submission; (2) approve the submission or portions of the submission upon specified conditions; (3) approve part of the submission and disapprove the remainder; or (4) disapprove the submission and direct PRASA to modify the submission.  If PRASA has not received comments from EPA within 60 days of its submissions to EPA, EPA and PRASA shall schedule a meeting as soon as practicable to discuss the submission.

b.    In the event of approval of the complete submission, PRASA shall proceed to take any actions required by the plan, program or other approved document, in accordance with the schedule contained therein, as approved in writing by EPA.

c.    In the event of written approval of portions of the submission or approval upon specified conditions, PRASA shall proceed to take the actions identified in the non-deficient portion of the plan, program, other document, or portion thereof, if severable, in accordance with any applicable conditions specified by EPA, subject only to PRASA's right to invoke the Dispute Resolution procedures set forth in Section XXXI (Dispute Resolution) of this Consent Decree with respect to the conditions imposed or the disapproved portions. Implementation of any non-deficient portion of the submission shall not eliminate the potential for PRASA to incur stipulated penalties pursuant to Section XXII (Penalties) based on PRASA's failure to meet other approved requirements of the submission so long as such other approved requirements are technically severable from the disapproved portion(s) of the submission.

73.    Upon receipt of a notice of disapproval of all or part of a submission from EPA, PRASA shall, within thirty (30) days, correct the deficiencies as directed by EPA's written comments and resubmit the plan, program or other document for approval.  Any stipulated penalties applicable to the original submission, as provided in Section XXII ( Penalties) of this Consent Decree, shall accrue during the 30-day period, but shall not be payable unless the resubmission is untimely or is disapproved in whole or is materially deficient.

74.    In the event that a resubmitted plan, program or other document, or portion thereof, is disapproved by EPA, EPA may again require PRASA to correct the deficiencies in accordance with Paragraph 72a,  subject to PRASA's right to invoke the Dispute Resolution

procedures set forth in Section XXXI (Dispute Resolution) of this Consent Decree and the right of EPA to seek stipulated penalties as provided in Section XXII (Penalties).

75.     If PRASA timely submits or resubmits an item for review and approval or comments under this Consent Decree, and if EPA fails to approve, provide comments or otherwise act on a submittal within sixty (60) days of receipt of the submittal, PRASA shall be entitled to an extension of any interim or final deadlines which PRASA can demonstrate that it will be unable to meet as a result of the length of the review process.  Any such request must be in writing and must identify the deadlines for which an extension is requested, the length of the extension requested, and set forth the basis for each such request.  In the event that EPA should disapprove, in whole or in part, the extended deadline requested by PRASA, PRASA may invoke Section XXXI (Dispute Resolution) of the Consent Decree.

76.     If PRASA submits or resubmits a plan, program or other document that fails to contain all of the required elements as set forth in the appropriate Section or Appendix pertaining to the requisite contents of the (i) the Corrosion Control Plan (part of the IMP); (ii) Bi-annual (or other) Progress Reports; (iii) S2OMP; (iv) Areas of Concern; (v) NMCR;  (vi ) CMMR; (vii) SRCP; and (viii) any other submissions developed in accordance with Sections V (Remedial Measures at WTPs) and VII (Remedial Measures at WWTPs and Sewer System Evaluations) and Appendices H (Base List of Remedial Measures for WTPs), I (Capital Projects Subject to Prioritization), and J (Base List of Remedial Measures for WWTPs), PRASA shall be deemed to have failed to make the submission, unless PRASA invokes the Dispute Resolution procedures in Section XXXI (Dispute Resolution).  In the case of a submission or resubmission that fails to contain all the required elements, stipulated penalties begin to accrue on the date the submission or resubmission was due.

77.    PRASA may request in writing that EPA grant an extension of any deadline established by this Consent Decree, and EPA shall grant in writing if it determines that good faith efforts to comply with the timetables established in this Consent Decree have been made and good cause for the requested extension has been shown.  The granting of such an extension pursuant to this Paragraph is not necessarily a material modification within the meaning of Section XXXVII (Modification) of this Consent Decree.

## XXII.        PENALTIES

*Stipulated Penalties Under Prior Consent Decrees*

78.    Under the WWTP Decree and the WTP Decree, PRASA was permitted to pay certain stipulated penalty amounts into an escrow account.  The penalties permitted to be placed into escrow included penalties pertaining to exceedances of the monthly average effluent limitation for either interim effluent limitations or final NPDES Permit effluent limitations.  These stipulated penalties were placed into escrow because a certain percentage of the stipulated penalty amount would be returned to PRASA for completing short term, mid-term or long term capital improvement projects ahead of the deadline set forth in either the WWTP or WTP Consent Decree.  The percentage amount returned to PRASA depended upon the number of days the project was completed ahead of schedule.  These amounts were not due and owing to the United States.  As of December 31, 2014, PRASA has placed $5,068,588.00 in an escrow account.  EPA and PRASA have determined that $5,001,688.00 of this amount is now due and owing to the United States from the amounts placed into the escrow account.  PRASA shall pay this amount to the United States according to the instructions set forth in Paragraph 86 no later than thirty (30) days from the Date of Lodging.  The sum of $66,900.00 shall be returned to PRASA for completing projects ahead of schedule as authorized in Prior

Consent Decrees.  PRASA has agreed to cease placing stipulated penalties under either the WWTP or WTP Consent Decree into escrow account for stipulated penalties that accrued after December 31, 2014.  Any effluent limitation violations that occurred after December 31, 2014, and occur through the Date of Entry, shall be paid to the United States at the stipulated penalty amounts indicated in Paragraph 42b and 42c of the WWTP Decree and Paragraph 63b and 63c of the WTP Decree.  PRASA shall pay the amount owed during this period to the United States no later than ninety (90) days from the Date of Entry.

79.    If PRASA fails to pay the stipulated penalty amount of $5,001,688.00 by the due date referenced in Paragraph 78, interest shall thereafter accrue at the rate calculated pursuant to 28 U.S.C. § 1961 through the date of payment.  The payment of interest shall be in addition to any stipulated penalties that may accrue pursuant to this Penalties Section.

*Stipulated Penalties Under This Consent Decree*

80.    PRASA shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified below, unless excused under Section XXVII (Force Majeure).  A violation includes failing to perform any obligation required by the terms of this Decree, including any work plan or schedule approved under this Decree, according to all applicable requirements of this Decree and within the specified time schedules established by or approved under this Decree.  The stipulated penalties shall be paid by PRASA to the United States after receiving written demand by EPA, except where otherwise indicated, for stipulated penalties in the amounts set forth below for the below listed violations of this Consent Decree. Each violation described below pertains to each Facility and Sewer System covered by this Consent Decree unless otherwise indicated.

a. For each day that PRASA fails to implement and complete the requirements specified for each Facility and Sewer System covered by this Consent Decree in accordance with the applicable schedules, including all benchmarks and interim deadlines developed after the Effective Date of this Decree, PRASA shall be liable for stipulated penalties as follows:

| Period of noncompliance | Per day per violation |
| --- | --- |
| 1 - 60 days | $200 |
| 61 - 120 days | $1,000 |
| Over 120 days | $2,500 |

The above referenced stipulated penalties shall accrue per violation per day for each violation of the requirements under this Decree as indicated below:

i.  failing to comply with the deadlines developed pursuant to Section V (Remedial Measures at WTPs), and Section VII (Remedial Measures at WWTPs and Sewer System Evaluations) as set forth in Appendices H (Base List of Remedial Measures to Address Washwater Discharges at WTPs), Appendix I (Capitol Projects Subject to Prioritization), and Appendix J (Base List for Remedial Measures for WWTPs, which includes the I/I studies and repairs as required by Paragraph 19;

ii.  failing to ensure that Flow Meter Devices installed and in operation at the WTPs and WWTPs as required by Paragraphs 9-10 and 70-71;

iii.  failing to ensure that new WTPs have APUs installed as required by Paragraph 13;

iv.  failing to ensure that High Level Indicators are installed and in operation at the WTPs as required by Paragraphs 11-12;

v.  failing to notify EPA within twenty-four (24) hours if sludge generated by STS is spilled onto land or water;

vi.  failing to keep a log book for sludge removed from each STS according to each requirement as set forth in Paragraph 16;

vii.  failing to retain the log book for at least two (2) years as required by Paragraph 17;

    viii.      failing to undertake the Caño Martín Peña Projects as required by Paragraph 32 and Appendix O;

    ix.      failing to complete the Barriada Figueroa Sewer Project as required by Paragraph 34;

    x.      failing to eliminate the interconnections found in the Sewer System as required by Paragraph 23b.;

    xi.      failing to establish  PCS at new STSs or WWTPs according to requirements of  Section XVII (Continued Implementation of PCS); or

    xii.      failing to implement the minimum requirements of the SRCP (which includes notifications of SSOs and Unauthorized Releases island-wide) as required by Section XVIII (SRCP) and Appendix W (Minimum Requirements of SRCP) to the extent that stipulated penalties have not been addressed by Paragraph 80b below.

b.    For each day PRASA fails to implement the S2OMP for the items identified below, PRASA shall be liable for the stipulated penalties as follows:

| Period of noncompliance | Per day per violation |
| --- | --- |
| 1 - 30 days | $200 |
| 31 - 60 days | $1,000 |
| Over 60 days | $2,500 |

The above referenced stipulated penalties shall accrue per violation per day for each violation of the requirements under the S2OMP Section of this Decree, which includes the items listed below and other items that may arise as the S2OMP develops:

    i.      failing to complete the Sewer System Reconnaissance and Sewer Cleaning as required by Paragraphs 23 and 24 and Appendix L;

    ii.      failing to modify schedule for sewer cleaning and reconnaissance as required by Paragraph 25;

    iii.      failing to operate and utilize maintain at least two flush/vacuum trucks solely dedicated to providing preventive sewer maintenance to assist PRASA in cleaning the sewers as required by Paragraph 25;

    iv.    failing to notify the public of CSO occurrences as required in the NPDES Permit and Paragraph 30a;

    v.    failing to estimate flows of the amount of discharges from CSO Outfalls according to schedule identified in Paragraph 28;

    vi.    failing to report any DWO to EPA within 24 hours as required by Paragraph 30a and Appendix N (EPA Reporting Form), or a similar form as approved by EPA;

    vii.    failing to respond to SSO, CSO or Unauthorized Release that occur in the Puerto Nuevo Sewer System in accordance with the SRCP approved by EPA and Paragraph 30b; and

    viii.    failing to notify EPA when an SSO or Unauthorized Release occurs and discharges to waters of the United States as required by Paragraph 30d.

    c.    For each day PRASA fails to submit a Deliverable identified below, PRASA shall be liable for stipulated penalties as follows:

| Period of noncompliance | Per day per violation |
|---|---|
| Days 1 - 30 | $500 |
| Days 31 - 60 | $1,000 |
| Over 60 days | $2,500 |

The Deliverables required to be submitted under this Decree include the following:

    i.    Compliance plans and schedule for the I/I Studies identified in Paragraph 19;

    ii.    Revised CMM and NMC Reports according to requirements of Paragraph 21d;

    iii.    S2OMP for the Puerto Nuevo RWWTP Sewer System according to requirements of Section IX (Sewer System Operation and Maintenance Program and Condition Assessment Program with Respect to the Puerto Nuevo Regional Wastewater Treatment Plant Sewer System) and Appendix G;

    iv.    Submission of any necessary revisions to S2OMP as required by Paragraph 22 of this Decree;

     v.      S2OMP Annual Report as required by Paragraph 22b;

    vi.     Schedule to complete the Sewer System Reconnaissance and Sewer Cleaning of the remaining Puerto Nuevo RWWTP Sewer System as required by Paragraph 26;

   vii.     Revised FOG Control Program in accordance with requirements of Paragraph 29 and Appendix M;

  viii.     Plan and proposed schedule to undertake Condition Assessment of the Puerto Nuevo RWWTP Sewer System as required by Paragraph 31;

    ix.     Condition Assessment Report as required by Paragraph 31;

     x.     Barriada Figueroa Sewer Investigation and Mapping Report as required by Paragraph 34a;

    xi.     Engineering Design Project Report for the Barriada Figueroa area as required by Paragraph 34b;

   xii.     Electronic Maps of Puerto Nuevo RWWTP Sewer System according to requirements of Paragraph 35;

  xiii.     Prioritization Report as required by Paragraphs 42-43;

  xiv.     Financial Reports as required by Paragraph 45;

   xv.     Corrosion Control Program as required by Paragraph 54 and  Appendix V; and

  xvi.     Training Program for Operators as required by Paragraph 56.

    d.    For each interim effluent limitation exceeded (except for Copper, Lead, Undissociated H2S, Mercury, Total Residual Chlorine and Cyanide) PRASA shall pay stipulated penalties automatically to EPA without demand as follows:

       If a violation of a parameter occurs in one month, but that same parameter is not violated in the following month:  $0

       If a violation of a parameter occurs in one month, and that same parameter is violated in the following month:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $100 |
| 21-60% | $1,000 |
| Above 60% | $2,000 |

However, if a violation of the same parameter occurs five times or more in one calendar year, for the fifth and subsequent violations in that calendar year:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $200 |
| 21-60% | $2,000 |
| Above 60% | $4,000 |

For each interim effluent limitation exceeded for Copper, Lead, Undissociated H2S, Mercury, Total Residual Chlorine and Cyanide, PRASA shall pay stipulated penalties to EPA on demand as follows:

If a violation of a parameter occurs in one month, but that same parameter is not violated in the following month:  $0

If a violation of a parameter occurs in one month, and that same parameter is violated in the following month:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $100 |
| 21-60% | $1,000 |
| Above 60% | $2,000 |

However, if a violation of the same parameter occurs five times or more in one calendar year, for the fifth and subsequent violations in that calendar year:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $200 |
| 21-60% | $2,000 |
| Above 60% | $4,000 |

PRASA shall summarize and assess the stipulated penalty amounts for these interim effluent limitation stipulated penalties in the applicable Bi-annual Report covering the last six months of the calendar year. PRASA shall pay to EPA the amounts of stipulated penalties associated with these violations that are due automatically and without demand no later than thirty (30) days after the corresponding Bi-annual Report is submitted to EPA.

e.      For each final NPDES Permit effluent limitation exceeded (except for Copper,

Lead, Undissociated H2S, Mercury, Total Residual Chlorine and Cyanide) PRASA shall pay

stipulated penalties automatically to EPA without demand as follows:

If a violation of a parameter occurs in one month, but that same parameter is not
violated in the following month:  $0

If a violation of a parameter occurs in one month, and that same parameter is violated in
the following month:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $100 |
| 21-60% | $1,000 |
| Above 60% | $2,000 |

However, if a violation of the same parameter occurs five times or more in one calendar
year, for the fifth and subsequent violations in that calendar year:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $200 |
| 21-60% | $2,000 |
| Above 60% | $4,000 |

For each final effluent limitation exceeded for Copper, Lead, Undissociated H2S,

Mercury, Total Residual Chlorine and Cyanide, PRASA shall pay stipulated penalties to EPA

on demand as follows:

If a violation of a parameter occurs in one month, but that same parameter is not
violated in the following month:  $0

If a violation of a parameter occurs in one month, and that same parameter is violated in
the following month:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $100 |
| 21-60% | $1,000 |
| Above 60% | $2,000 |

However, if a violation of the same parameter occurs five times or more in one calendar year, for the fifth and subsequent violations in that calendar year:

| Percent above limit | Per day per violation |
|---|---|
| Up to 20% | $200 |
| 21-60% | $2,000 |
| Above 60% | $4,000 |

PRASA shall summarize and assess the stipulated penalty amounts for these interim effluent limitation stipulated penalties in the applicable Bi-annual Report covering the last six months of the calendar year.  PRASA shall pay to EPA the amounts of stipulated penalties associated with these violations that are due automatically and without demand no later than (30) days after the corresponding Bi-annual Report is submitted to EPA.

f.    For each effluent limitation (interim and/or final) established for each Plant that PRASA fails to report, or fails to report with a numeric value, to EPA in the monthly Discharge Monitoring Reports, PRASA shall pay automatically without demand stipulated penalties in the amount of $150 per parameter for every result not reported in that reporting period.  For those monthly average parameters that are not reported in the monthly Discharge Monitoring Report, PRASA shall pay automatically without demand a stipulated penalty in the amount of $500 per parameter.  PRASA shall not have to pay stipulated penalties if it submits an amended Discharge Monitoring Report for that reporting period that supplies the missing data to cure the violation(s) under this subparagraph no later than the due date of the Discharge Monitoring Report for the next reporting period.  Any re-analysis done on samples taken must be done on samples taken in the month for which the Discharge Monitoring Report was required.  If the entire Discharge Monitoring Report is submitted late, PRASA shall pay stipulated penalties to EPA automatically and without demand in the amount of $100 per day for the first ten (10) days and $500 per day thereafter.

PRASA shall summarize and assess the stipulated penalties for these effluent limitation violations in the applicable Bi-annual Reports covering the last six months of the Calendar year.  PRASA shall pay to EPA the amounts of stipulated penalties associated with these

violations no later than thirty (30) days after the corresponding Bi-annual Reports submitted to EPA.

g.   For each parameter that PRASA fails to monitor for the existing STSs that do not have effective NPDES Permits as required by Paragraph 66, PRASA shall pay stipulated penalties automatically in the amount of $500 per parameter.  PRASA shall summarize and assess the stipulated penalties for failing to monitor STSs in the applicable Bi-annual Reports covering the last six months of the Calendar year.  PRASA shall pay to EPA the amounts of stipulated penalties associated with these violations no later than thirty (30) days after the Bi-annual Reports submitted to EPA.

h.   For each unanticipated sanitary sewer overflow (as defined in the applicable NPDES Permit) from a Pump Station, PRASA shall pay stipulated penalties automatically and without demand as follows:

| Period of Non-compliance | Per day per Violation |
|---|---|
| Days 1 -3 | $100 |
| Days 4 – 10 | $500 |
| Over 10 Days | $1,000 |

PRASA shall summarize and assess the stipulated penalties for unanticipated sanitary sewer overflows at the Pump Stations in the applicable Bi-annual Reports covering the last six months of the Calendar year.  PRASA shall pay to EPA the amounts of stipulated penalties associated with these violations automatically and without demand no later than thirty (30) days after the Bi-annual Reports submitted to EPA.

i.   For each day PRASA fails to submit Bi-annual Reports, PRASA shall be liable for stipulated penalties from EPA stipulated penalties as follows:

| Period of noncompliance | Per day per violation |
|---|---|
| Days 1 - 14 | $500 |
| Days 15 - 30 | $1,000 |

Over 31 days                    $2,500

If EPA notifies PRASA that the Bi-annual Report is missing any required information, PRASA shall supply the requested information within seven (7) days or the report shall be deemed not submitted and PRASA shall pay stipulated penalties under this sub-paragraph until it supplies the requested information and the Bi-annual Report is deemed complete.

j.    If EPA finds that the IMP is not being implemented in practice according to the requirements of Appendix U (Minimum Requirements of the Integrated Maintenance Program), EPA shall send notice to PRASA identifying the problems and areas of non-compliance.  PRASA has sixty (60) days from date of notice by EPA to cure the deficiencies at each applicable Facility as set forth in EPA's notice.  If PRASA fails to cure deficiencies set forth in EPA's notice within sixty (60) days, PRASA shall pay $1,000 per deficiency not properly addressed.

k.    For each violation of the following requirements, PRASA shall pay stipulated penalties to  EPA as follows:

i.    Payment of stipulated penalties to EPA automatically, and without demand, of $500 per day per location for failing to undertake the actions required at each location as required by Appendix R (Areas of Concern); and

ii.   Payment of stipulated penalties to EPA on demand of $100 per day per location for failing to submit notification to EPA to Sharepoint Site when the action is completed in each location as  required by Section XII (Areas of Concern).

PRASA shall summarize and assess the stipulated penalties referenced above in sub-paragraph k (i) if they fail to undertake the actions required in Appendix R, or actions required in any newly identified Areas of Concern as provided for in Section XII (Areas of Concern).

In addition to paying stipulated penalties as provided for in this Decree, PRASA shall convene a community meeting in the affected area where continuous overflows are occurring to inform the affected residents of the following:  conditions that are causing such continuous overflows, actions PRASA is taking to address those overflows, and the expected date to eliminate the overflows.  Such community meetings shall be convened within two (2) weeks of PRASA's knowledge of the continuous overflows.  For purposes of this sub-paragraph, continuous overflows are defined as those discharges that occur in two consecutive weeks.

l.    If EPA finds that the PCS at each STS and WWTP is not being implemented in practice according to the requirements of Section XVII (Continued Implementation of a Process Control System), EPA shall send notice to PRASA identifying problems and areas of non-compliance.  PRASA has sixty (60) days from date of notice by EPA to cure the deficiencies at each applicable STS and WWTP as set forth in EPA's notice.  If PRASA fails to cure deficiencies set forth in EPA's notice within sixty (60) days, PRASA shall pay $1,000 per deficiency not properly addressed.

m.    If PRASA fails to perform the training as required by Paragraphs 56 and 57 PRASA shall pay a stipulated penalty of $100 for every employee not trained by the requirements set forth in this Decree.

81.    Any stipulated penalty based upon a violation of a Consent Decree provision shall be paid to the United States.

82.    Where PRASA is required to summarize and assess stipulated penalties due automatically, without demand by EPA, under this Section, PRASA shall pay those assessed penalties no later than thirty (30) days after the appropriate Bi-annual Report.  PRASA shall continue to calculate and report all the stipulated penalty amounts incurred in the appropriate

Bi-annual Report as required by this Section.  PRASA shall clearly explain in the Bi-annual Report the period of non-compliance event(s), referencing the provision of the Consent Decree violated, and the amount of Stipulated Penalty due (including how the amount was calculated for each violation of the Decree).

83.    For penalties demanded pursuant to subparagraphs a – e and i – m of Paragraph 80, payment shall be made within sixty (60) days of receiving EPA's written demand, which shall detail the noncompliance event indicating the paragraph of the Decree violated and the period of noncompliance event(s) including the duration of the violation.  The letter accompanying the payment shall include the following information: the non-compliance event indicating the paragraph of the Decree violated, the period of non-compliance event(s) including the duration of the violation, and the amount owed to the United States for each non-compliance event.

84.    All stipulated penalties begin to accrue on the day that complete performance is due or a violation occurs, and continue to accrue through, and including, the day on which such violation or other noncompliance is remedied.  Nothing herein shall preclude the simultaneous accrual of separate stipulated penalties for separate violations of this Consent Decree.

85.    In the event that a stipulated penalty is not paid when due or within 60 days of demand made by EPA, the penalty shall be payable with interest from the original due date to the date of payment, at the statutory judgment rate set forth at 28 U.S.C. 1961, and plus the amount of the United States reasonable costs, attorneys fees or other expenses incurred in seeking payment of the civil or stipulated penalty.

86.    Stipulated penalties paid to the United States under this Section shall be paid by FedWire Electronic Funds Transfer (EFT) to the Department of Justice account, in accordance

-72-

with instructions provided to PRASA from the Financial Litigation Unit (FLU) of the US

Attorneys Office of the District if Puerto Rico after the Date of Entry.  The payment

instructions will include a Consolidated Debt Collection System (CDCS) Number which

PRASA shall include to identify all payments required to be made in accordance with this

Decree.  PRASA shall identify to the FLU the individual at PRASA to receive payment

instructions.

87.    Nothing in this Section shall be construed as prohibiting, altering, or in any way

limiting the rights of the United States to seek additional remedies or sanctions, pursuant to

other provisions of this Consent Decree or of any applicable statutes and regulations, including

seeking injunctive or other relief for PRASA's failure to implement the injunctive relief

provisions as agreed to in this Consent Decree.

88.    Upon the Date of Entry, the stipulated penalty provisions of this Consent Decree

(Paragraphs 80-89) shall be retroactively enforceable with regard to any and all violations of

this Decree that have occurred from the Date of Lodging through the Date of Entry.  Provided

that stipulated penalties that may have accrued prior to the Date of Entry may not be collected

under and until this Consent Decree is entered by the Court.

89.    EPA may in the unreviewable exercise of its discretion, reduce or waive

stipulated penalties otherwise due under the Consent Decree.

## XXIII.        REMOVAL OF WWTPS and STSs FROM  DESIGNATED STIPULATED PENALTY PROVISIONS

90.    EPA and PRASA agree that the STSs and WWTPs subject to this Consent

Decree will be eligible to be removed from certain stipulated penalty provisions of the Consent

Decree as set forth below.

91.   For a STS to be eligible for removal from the designated stipulated penalty provisions, PRASA must demonstrate that such STS is in compliance with the following requirements of this Consent Decree:

a.   Payment in full of any and all penalties due under this Consent Decree;

b.   Compliance with all final permit effluent limitations and Permit conditions, as evidenced in the DMRs, for six (6) consecutive months preceding the date on which removal from designated stipulated penalties is sought; and

c.   All remedial actions required under Sections V (Remedial Measures at STSs) and VI (New STS Plants and Solids Handling) of this Consent Decree have been completed.

92.   For a WWTP or STS to be eligible for removal from the designated stipulated penalty provisions, PRASA must demonstrate that each WWTP or STS is in compliance with the following requirements of this Consent Decree:

a.   Payment in full of any and all penalties due under this Consent Decree;

b.   Compliance will all final permit effluent limitations and Permit conditions, as evidences in the DMRs, for six (6) consecutive months preceding the date on which removal from designated stipulated penalties is sought;

c.   All remedial actions required under Sections V and VII and Appendices H-J have been completed; and

d.   An EPA-approved IMP, SRCP and PCS have been implemented at that particular Facility for at least eighteen (18) months without any notices of failure to comply the IMP, SRCP or PCS having been issued by EPA for six (6) consecutive months preceding the date on which removal from designated stipulated penalties is sought.

93.    When the above conditions are met, PRASA will certify in writing that it has complied with all applicable requirements of this Section with regard to the STS or WWTP and request to EPA that the STS or WWTP be removed from the designated stipulated penalty provisions of the Consent Decree.

94.    EPA will review all relevant compliance information as to that STS or WWTP, including, but not limited to, DMRs and Bi-Annual Progress Reports, to determine whether that Plant has met the requirements of this Section for removal from designated stipulated penalties.  EPA reserves the right to inspect any STS or WWTP prior to its removal from the designated stipulated penalty provisions of this Consent Decree.

95.    EPA shall inform PRASA in writing of its determination regarding whether the STS or WWTP covered by this Consent Decree meets the requirements of this Section. Designated stipulated penalties shall be tolled during this review period.  If EPA determines that the requirements of this Section have not been met as to that Plant, the designated stipulated penalties, if any, shall be retroactively imposed and shall be paid in accordance with the provisions of Section XXII (Penalties) of this Consent Decree.   If EPA determines that the requirements of this Section have been met as to that Plant, it shall confirm this determination to PRASA in writing.

96.    For purposes of this Section and Section XXIV (Reincorporation) below, designated stipulated penalties include subparagraphs d and e of Paragraph 80 Section XXII (Penalties).

97.     Nothing herein shall relieve PRASA from complying with all other provisions of this Consent Decree with respect to any WTPs or WWTPs that have been removed from the designated stipulated penalties provisions.

XXIV.        **REINCORPORATION OF WTPS OR WWTPS INTO DESIGNATED STIPULATED PENALTY PROVISIONS**

98.    A STS or WWTP removed from the designated stipulated penalties provisions of this Consent Decree shall be reincorporated in the designated stipulated penalties provisions if the Facility is in noncompliance with a NPDES Permit final effluent limit by the percentage identified below for a period of three consecutive months, based on the following criteria:

Conventional Pollutants (40% exceedance of limit)

Biochemical Oxygen Demand
Total Dissolved Solids
Flow
Inorganic Phosphorus Compounds
Fecal Coliform
Enterococcus

Toxic Pollutants (20% exceedance of limit)

Metals
Total Residual Chlorine

99.    In the event that any parameter listed above is in noncompliance for three consecutive months (three DMR reporting cycles), PRASA shall notify EPA in the next Bi-Annual Report submitted that the STS or WWTP satisfies the reincorporation criteria.

100.   Upon receipt of notice from PRASA in the Bi-annual Report, that such STS or WWTP is in noncompliance with the criteria identified in this Section or when EPA determines that such conditions as set forth in Paragraph 98 have been met and so notifies PRASA, such STS or WWTP shall be deemed reincorporated into the designated stipulated penalties provisions without further action by EPA.   For purposes of this Paragraph, the

assessment of stipulated penalties shall begin to accrue from the day the STS or WWTP satisfies the conditions as set forth in Paragraph 98.

101.  Any designated stipulated penalties accruing subsequent to the three month noncompliance period shall be double the amounts set forth in Section XXII (Penalties) of this Consent Decree.  Non-designated stipulated penalties shall remain at the original amounts as set forth in that Section.  All stipulated penalties shall be due and payable in the manner prescribed in Section XXII (Penalties).

## XXV.        BI-ANNUAL REPORTS

102.  Beginning May 1, 2016, for the period covering September 1, 2015 through February 29, 2016, and every six (6) months thereafter throughout the effective period of this Consent Decree, PRASA shall submit to EPA a written report on a bi-annual basis detailing the current status and/or progress of the actions taken in compliance with this Consent Decree.  The Bi-annual Progress Report shall report on PRASA's activities with regard to Section V (Remedial Measures at WTPs) through XXI (Review and Approval Procedures) of this Consent Decree, along with all pertinent Deliverables required to be submitted under this Consent Decree, and at a minimum shall set forth:

a.    the  status of remedial measures being undertaken by PRASA relating to completion of Work required under the compliance schedules specified in this Consent Decree, including but not limited to the expected date for the Substantial Completion of any of the remedial actions Appendix H (Base List for Remedial Measures to Address Washwater Discharges at WTPs), Appendix I (Capital Projects subject to Prioritization), and Appendix J (Base List of Remedial Measures for WWTPs) and identification of those requirements which have been accomplished since the previous report, including the dates of Substantial

Completion of any of the remedial/measures identified in Appendix H (Base List for Remedial Measures to Address Washwater Discharges at WTPs), Appendix I (Capital Projects subject to Prioritization), and Appendix J (Base List of Remedial Measures for WWTPs);

     b.   the status of remedial measures being undertaken by PRASA related to Work being performed under this Consent Decree or as required by Section XI (Sewer System Evaluations and Repairs;

     c.   any impediments encountered by PRASA in meeting the compliance schedules under this Consent Decree, the steps that have been taken by PRASA to overcome such impediments and the steps that are to be taken by PRASA to overcome such impediments, including the anticipated dates by which such steps will be taken;

     d.   locations of any interconnections found as required by Paragraph 23;

     e.   locations of any SSOs, DWOs and/or unauthorized releases as required by Paragraph 30d;

     f.   a list of all Facilities that have been shut down or otherwise taken off-line or consolidated with other Facilities, and all new WTPs or WWTPs that have commenced operation or existing WTPs or WWTPs that have been returned to service during the preceding reporting period, such list to include the name and address of each such Facility and identification of the NPDES or other Permit authorizing its operation;

     g.   a description of the requirements of this Consent Decree subject to stipulated penalties which were not complied with, including the dates of each individual non-compliance event and the individual computation made in determining the amount of stipulated penalties due;

h.    as to effluent limitation violations, stipulated penalty calculations shall be reported for each individual Plant;

i.    any change in PRASA personnel at the Executive President and Regional Director levels;

j.    results of interim weekly and monthly limit monitoring as required by Section XIX (Monitoring, Records, and Reporting Requirements of Unpermitted STS);

k.    certification regarding training requirements as required by Section XVI (Training and Additional Requirements for Operators) and Paragraph 56;

l.    notification of commencement of construction of any STS at any PRASA WTP as required by Paragraph 14;

m.    results of any Prioritization System analysis conducted by PRASA during the relevant time period or the reasons for not running a Prioritization Report as required by Paragraph 40;

n.    Status of the S2OMP implementation activities, and specific summary of Puerto Nuevo RWWTP Sewer System cleaning and inspections completed for the last six (6) months, and projected future cleaning and inspections for this Sewer System; and

o.    Status of the implementation of the Caño Martín Peña Projects as required by Section X (Caño Martín Peña Projects).

103.  PRASA shall annually report on the anniversary of the Date of Lodging on its current financial situation including but not limited to its debt service coverage ratio, senior lien coverage ratio, liquidity, any approved future rate increases, status of debt to plant ratio, key financial ratios monitored internally and for lender(s), current bond ratio and current bond ratings, and number of customers by service pipe.  PRASA shall also submit its most recent

annual financial report, bond prospectus issued during prior year and any rating agency report received during the previous year.  In addition to financial reporting requirements, PRASA shall provide notice of any change in bond rating status within ten (10) days of any such change. PRASA shall submit the Bi-annual Progress Reports within sixty (60) days after the end of the six (6) month period being reported.  The above reporting requirements do not relieve PRASA of the obligation to submit reports or information required by the CWA, regulations promulgated thereunder, the NPDES Permits, or any other permit or local or federal law.

104.  PRASA may elect to submit separate Bi-annual Reports from its five regional offices, provided (i) the same information described in this Section is included in such reports; (ii) the Responsible Official and Regional Director(s) of PRASA have certified in writing that each has reviewed each report prior to submission to EPA; and (iii) PRASA has complied with 40 C.F.R. § 122.22 with respect to authorizing the appropriate Regional Directors as signatories.  EPA may, in its discretion, and upon thirty (30) days notice in writing to PRASA, require that PRASA submit only one Bi-annual Report per submittal date.  All Bi-annual Reports and other submissions required pursuant to this Consent Decree shall be in English and signed by a Responsible Official, which shall include Regional Directors if PRASA elects to submit regional reports.  The Bi-annual Reports and all other submissions shall contain the following certification:

> I certify t hat b ased on  m y i nquiry  of t he pe rson or  pe rsons
> directly r esponsible f or  gathering th e in formation, th e
> information contained in or accompanying this submission is, to
> the b est o f m y k nowledge an d b elief, t rue, accu rate, an d
> complete.  I am  aware  that t here ar e s ignificant p enalties f or
> submitting false information, or for failure to submit information

required t o be s ubmitted unde r t his C onsent D ecree, i ncluding the possibility of fine and imprisonment for knowing violations.

## XXVI.        **TRIANNUAL PROGRESS MEETINGS**

105.  Representatives of EPA and PRASA shall convene informally at least on a triannual basis (three times per year) pursuant to a mutually agreed-upon schedule to discuss PRASA's ongoing progress under the Consent Decree.  The meeting should cover at least the following subjects:

a.    Progress in the implementation of the actions required by this Consent Decree including but not limited to all the remedial actions listed in Appendices H-J and the S2OMP cleaning and Sewer System Reconnaissance efforts;

b.    Potential problems that may adversely affect progress in implementing the actions required by this Consent Decree;

c.    Measures that PRASA intends to take to correct problems and deficiencies encountered by PRASA or found by EPA in its inspections of any Facility and Sewer System covered by this Consent Decree; and Status of compliance with effluent limits; and

d.    Measures that PRASA is taking to dedicate more resources to the S2OMP activities under this Decree; and

e.     Cleaning and re-inspection schedules for the Puerto Nuevo RWWTP Sewer System.

106.  If, as a result of discussions at the Triannual Progress Meetings, EPA and PRASA agree on actions to be taken and a schedule for such action that are not otherwise provided for in this Consent Decree, including any actions resulting from PRASA's Prioritization System, the United States and PRASA shall, after consultation with counsel,

follow the procedure set forth in Section XXXVII (Modification).  The EPA and PRASA may

agree to meet on a bi-annual basis, rather than a triannual basis two (2) years after the Date of

Entry.  Such agreement shall be memorialized in writing by both the United States and

PRASA, and shall not be considered a material modification for purposes of Section XXXVII

(Modifications) of this Decree.

**XXVII.      <u>FORCE MAJEURE</u>**

107.  PRASA's obligation to comply with one or more of the provisions of

this Consent Decree shall be deferred or, in the sole discretion of EPA, excused, to the extent

that the delay in compliance or the non-compliance is caused by a force majeure event.  Force

majeure, for purposes of this Consent Decree, is defined as any event arising from causes

beyond the control of PRASA that delays or prevents the performance of any obligation or

causes a non-compliance under this Consent Decree despite PRASA's best efforts to fulfill the

obligation.  The requirement that PRASA exercise best efforts to fulfill the obligation includes

using best efforts to anticipate any potential force majeure and best efforts to address the

effects of any potential force majeure (i) as it is occurring; and (ii) following the potential force

majeure, such that the delay is minimized to the greatest extent possible.  Force majeure shall

not include any delay due to unanticipated or increased costs of achieving and maintaining

compliance with any provision of this Consent Decree or PRASA's financial inability to

implement any provision of this Consent Decree.  PRASA's failure to obtain any necessary

permit or approval shall not be deemed a force majeure unless PRASA demonstrates that it

exercised due diligence in promptly pursuing such permit application or approval.  The United

States and PRASA agree that, depending upon the circumstances related to an event and

PRASA's response to such circumstances, the kinds of events listed below are among those

that could qualify as force majeure events within the meaning of this Section: fire, hurricane, flood, riot, terrorism, or other circumstances beyond the control of, and without the fault of PRASA, or any entity controlled by PRASA, including PRASA's consultants and contractors.

108.  If any alleged force majeure event occurs or has occurred that may delay the performance or cause a non-compliance of any obligation under this Consent Decree, PRASA shall notify EPA no later than five (5) working days after PRASA first knew or should have known that the event might cause a delay.  Within ten (10) days thereafter, PRASA shall provide in writing to EPA an explanation and description of the reasons for the delay or non-compliance; the anticipated duration of the delay or non-compliance; all actions taken or to be taken to prevent or minimize the delay or non-compliance; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or non-compliance or the effect of the delay or non-compliance; and PRASA's reason(s) for attributing such delay to a force majeure, if PRASA intends to assert such a claim.  Any written claim of a force majeure event shall be detailed and Facility and Sewer System specific.  PRASA shall include with any notice all available documentation supporting the claim that the delay was attributable to a force majeure.

109.  Failure to comply with the above procedures regarding notification and reporting shall preclude PRASA from asserting any claim of force majeure for that event for the period of time of such failure to comply, unless such failure to comply with the foregoing procedures regarding notification is itself attributable to a force majeure event.  PRASA further agrees that, notwithstanding giving notice to EPA within five (5) working days, any unreasonable delay in notifying EPA of an alleged force majeure event may hinder or preclude

EPA from substantiating an assertion by PRASA that the delay in compliance or the non-compliance in question is attributable to a force majeure event.

110.  If EPA agrees that the delay or non-compliance or anticipated delay or non-compliance is attributable to a force majeure, the time for implementation of the applicable portions of this Consent Decree that are affected by the force majeure will be extended by EPA for a period to compensate for the delay resulting from such event, and stipulated penalties shall not accrue for such period.  An extension of time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation or toll the accrual of stipulated penalties for failure to perform such obligation.  If EPA does not agree that the delay or non-compliance or anticipated delay or non-compliance has been or will be caused by a force majeure, EPA will notify PRASA in writing of its decision.  If EPA agrees that the delay is attributable to a force majeure, EPA will notify PRASA in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

111.  If PRASA elects to invoke the dispute resolution procedures set forth in Section XXXI (Dispute Resolution), with regard to a force majeure determination, it shall do so no later than thirty (30) days after receipt of EPA's written notice of its decision.  In any such proceeding, PRASA shall have the burden of demonstrating by a preponderance of the evidence that the delay or non-compliance or anticipated delay or non-compliance has been or will be caused by a force majeure, that the duration of the delay or non-compliance or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid or mitigate the effects of the delay, and that PRASA complied with the requirements of this Section of the Consent Decree.  If PRASA carries the burden, the delay at

issue shall be deemed not to be a violation by PRASA of the affected obligation of this

Consent Decree identified to EPA and to the Court.

### XXVIII.        NOTICES

112.  Whenever under the terms of this Consent Decree notice is to be

given, or a report or other document is to be forwarded by one party to another, it shall be

directed to the following addresses unless otherwise provided in this Consent Decree or unless

the sending party has been advised by the receiving party that such notice and reports should

be forwarded to a different individual or address.  Any such materials shall be in English and

shall include a reference to the name, caption and number of this action.

As to the United States:

Director, Caribbean Environmental Protection Division
United States Environmental Protection Agency
City View Plaza Suite 7000
#48, State Road No. 165, Km. 1.2
Guaynabo, Puerto Rico 00968-8069

Chief, Water and General Law Branch
Office of Regional Counsel
Unites States Environmental Protection Agency
Region II
290 Broadway, 16th Fl.
New York, New York   10007

By mail:                                    or By courier or express mail:

Chief, Environmental Enforcement Section    Chief, Environmental Enforcement Section
Environment & Natural Resources Division    Environment & Natural Resources Division
U.S. Department of Justice                  U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station.        601 D Street, N.W., Room 2121
Washington, D.C. 20044-7611                 Washington, D.C.  20005

For judicial filings only:

United States Attorney
District of Puerto Rico
Federal Office Building, Rm. 101
Carlos E. Chardón Avenue
San Juan, Puerto Rico 00918


As to PRASA:

By mail:                                              or By courier or express mail:

Executive President                                   Executive President
Office of General Counsel                             Office of General Counsel
Puerto Rico Aqueduct & Sewer Authority                Puerto Rico Aqueduct & Sewer Authority
P.O. Box 7066                                         Sergio Cuevas Bustamante Building
San Juan, Puerto Rico 00916-7066                      604 Avenida Barbosa
                                                      San Juan, Puerto Rico 00917


General Counsel                                       General Counsel
Office of General Counsel                             Office of General Counsel
Puerto Rico Aqueduct & Sewer Authority                Puerto Rico Aqueduct & Sewer Authority
P.O. Box 7066                                         Sergio Cuevas Bustamante Building
San Juan, Puerto Rico 00916-7066                      604 Avenida Barbosa
                                                      San Juan, Puerto Rico 00917


Executive Director, Compliance and                    Executive Director, Compliance and
Quality Control                                       Quality Control
Puerto Rico Aqueduct & Sewer Authority                Puerto Rico Aqueduct & Sewer Authority
Compliance and Quality Control Office                 Compliance and Quality Control Office
P.O. Box 7066                                         Sergio Cuevas Bustamante Building
San Juan, Puerto Rico 00916-7066                      604 Avenida Barbosa
                                                      San Juan, Puerto Rico 00917


        113.  Delivery shall be considered complete upon deposit of the material at issue in

the express mail, express courier service, or certified mail, or as otherwise specifically

provided herein.

114.  Documents required to be submitted under the terms of this Consent Decree may be submitted electronically, provided a paper copy is timely submitted to the Director of the Caribbean Environmental Protection Division in Puerto Rico.

**XXIX.**      **ACCESS TO THE FACILITIES**

115.  Nothing in this Consent Decree in any way limits any right of entry or access to PRASA facilities available to EPA pursuant to applicable federal or Commonwealth laws, regulations or permits.

**XXX.**      **RECORD RETENTION**

116.  Unless otherwise specified in this Consent Decree, PRASA shall preserve an original or a copy of all records, logs, and documents required to be kept under the CWA, any applicable regulations promulgated thereunder, and pursuant to the IMPs for each individual Facility and Sewer System covered by this Consent Decree for at least two (2) years after the termination of this Consent Decree, or as long as is required under the CWA, regulation, or Permit, if longer.  Drafts of documents for which a final version has been submitted to EPA pursuant to this Consent Decree need not be retained.  Upon request by EPA, PRASA shall provide copies to EPA of any such records, logs, and documents during the periods PRASA is required to preserve an original or copy of such records, logs, and documents.  Provided, however, that PRASA may eliminate documents after five (5) years upon written notice to EPA listing the documents PRASA plans to destroy and EPA's written approval.  If EPA does not respond in writing within ninety (90) days of receiving such notice, PRASA may destroy such documents.

117.  For purposes of this Section and of Section XXII (Penalties), PRASA shall be required to preserve at least the following records, logs and documents:

a.    Facility log books;

b.    The 24 hour and  five day notices/notification forms which include reports of SSOs, DWOs, and or Unauthorized Releases;

c.    Computerized or other written maintenance management system files in which routine facility maintenance information is loaded or otherwise recorded, including job orders for corrective or preventive maintenance for each facility;

d.    Inspection punch list or report performed at each Facility and Sewer System, covered by this Consent Decree, compiled daily, weekly, monthly, semi-annually or annually, as applicable;

e.    Police reports documenting employee security and/or vandalism-related incidents;

f.    Process Control related documents at each WWTP and STS; and

g.    CSO related documents for the Puerto Nuevo collection system.

## XXXI.        DISPUTE RESOLUTION

118.  The United States and PRASA shall make reasonable efforts informally and in good faith to resolve all disputes or differences of opinion regarding the meaning or implementation of this Consent Decree.  In the event that the United States and PRASA cannot resolve any such dispute, then the interpretation advanced by EPA shall be considered binding unless PRASA invokes the dispute resolution provisions of this Section.

119.  If, in the opinion of any party, there is a dispute with respect to the meaning or implementation of any provision of this Consent Decree, that Party shall send a written notice to the other Party which outlines the nature of the dispute and requests informal negotiations to

resolve the dispute.  Such period of informal negotiations shall not extend beyond forty-five

(45) days from the date when the notice was sent unless EPA and PRASA agree otherwise.

120.   If informal negotiations are unsuccessful, following the close of negotiations,

EPA shall provide in writing to PRASA a statement of position regarding the subject of the

dispute within forty-five (45) days following the close of negotiations.  EPA's statement of

position may include or reference, but not necessarily be limited to, any factual data, analysis,

or opinion supporting that position and all supporting documents relied upon by EPA.  If EPA

does not issue its statement of position within the prescribed period, PRASA may apply for an

order of the Court to require EPA to provide its position in writing.

121.   An administrative record of the dispute shall be maintained by EPA

and shall contain all statements of position, including supporting documentation, submitted by

either Party, and shall contain EPA's final statement of position.  EPA's position shall control

unless PRASA files with the Court a petition which shall describe the nature of the dispute and

include a proposal for its resolution.  Petitions by PRASA must be filed no more than twenty

(20) days after receipt by PRASA of EPA's final position.  The United States shall then have

twenty (20) days to respond to any such petitions.  In any such dispute, and subject to the

provisions of Section XXVII (Force Majeure), PRASA shall have the burden of proving that

EPA's position is arbitrary and capricious or otherwise not in accordance with law.  Judicial

review of EPA's position shall be based on the administrative record.

122.   Invocation of the dispute resolution procedures shall not toll the

accrual of stipulated penalties or any deadlines affected by the dispute, unless the United States

and PRASA agree in writing or the Court issues an order otherwise.  In any event, payment of

any accrued stipulated penalties shall be stayed pending the outcome of the dispute resolution

process.

## XXXII.         COMPLIANCE WITH APPLICABLE LAWS

123.  This Consent Decree in no way relieves PRASA of its responsibility

to comply with all applicable federal, Commonwealth and local laws, regulations, and permits,

and compliance with this Consent Decree shall not constitute a defense to any action pursuant

to said laws, regulations, or permits, except as otherwise provided in this Consent Decree or in

the CWA.  PRASA shall be responsible for obtaining all Commonwealth or local permits

which are necessary for the performance of any obligations imposed in this Consent Decree.

This Consent Decree shall not be construed as a determination of any issue related to any

federal, Commonwealth, or local permit, nor shall it be construed to be an NPDES Permit or a

modification of any NPDES Permit or other permit.

124.  Nothing in this Consent Decree relieves PRASA from any requirements

imposed on it relating to the CWA, SDWA, laws of the Commonwealth of Puerto Rico, or any

orders or Permits issued pursuant to the foregoing, with the exception of the Prior Consent

Decree and except as otherwise provided in this Consent Decree or in the CWA.

125.  In the Triannual Meetings, the EPA and PRASA agree to discuss significant

changes in law and/or regulations and whether such changes may require modification of this

Consent Decree pursuant to Section XXXVII (Modifications).

## XXXIII.       EFFECT OF SETTLEMENT

126.  Effective upon the Date of Entry of this Consent Decree, and in

consideration of the injunctive relief under this Consent Decree, except as expressly set forth

in Section XXXIV (Reservation of Rights), the United States covenants not to bring any

administrative or judicial action for violations of Sections 301, 402 and 504 of the CWA alleged in the Complaint filed in this matter that occurred up to and including the Date of Lodging.  Entry of this Consent Decree by the Court shall resolve the United States' civil claims, except as expressly set forth in Section XXXIV (Reservation of Rights) below, for violations of the above-referenced statutory provisions as alleged in the Complaint up to and including the Date of Lodging of the Consent Decree.

127.  This Consent Decree supersedes the Prior Consent Decrees, as defined in this Consent Decree, entered into between the United States and PRASA.  This Consent Decree shall not be construed to prevent or limit the rights of the United States to obtain penalties or injunctive relief under the CWA, regulations promulgated thereunder, or Permit conditions, except as expressly specified herein.

## XXXIV.    RESERVATION OF RIGHTS

128.  Notwithstanding any other provision of this Consent Decree, the United States reserves, and this Consent Decree is without prejudice to, all rights against PRASA with respect to all matters other than those alleged in its Complaint, including but not limited to the following:

a.    Claims based on a failure by PRASA to satisfy a requirement of this Consent Decree;

b.    Claims for civil and stipulated penalties, if any, under the terms of this Consent Decree;

c.    Any criminal liability;

d.    With respect to CWA violations that PRASA is required by statute, regulation or permit to report to EPA, claims based on PRASA's failure to report such violations that

otherwise would have been included within the scope of the allegations in the Complaint; and

e.    Actions to enforce any previous Orders of the Court, any Consent Decree between the United States and PRASA, and any administrative order issued by EPA to PRASA not expressly superseded by this Consent Decree.

129.   Except as provided in Section XXXIII (Effect of Settlement), the entry of this Consent Decree shall not limit or otherwise preclude the United States from taking additional criminal or civil enforcement action with regard to PRASA's Facilities, including all appurtenances thereto, pursuant to any federal or Commonwealth law, regulation or Permitting condition.  EPA reserves the right to order or to require PRASA to take such other corrective action or response measures as EPA deems necessary to protect human health or the environment.  Except as otherwise specified in this Consent Decree, PRASA reserves its right to raise any defense available to it to any such criminal, civil, or other corrective action instituted by the United States or any other party.

130.   This Consent Decree does not limit or affect the rights of PRASA or the United States against any third parties not named herein, nor the rights of third parties not Parties to this Consent Decree against any other parties, except as otherwise provided in this Consent Decree.  This Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Decree.  The United States and PRASA recognize that this Consent Decree resolves only certain matters between PRASA and the United States and that its execution does not preclude PRASA from asserting any legal or factual position in any action brought against them by any person or entity not a Party to this Consent Decree. Entry of this Consent Decree as a final judgment shall not be considered binding on PRASA in litigation with third parties.

131.  The execution of this Consent Decree in no way affects the pre-existing rights and obligations, if any, between PRASA and any prior operator of its Facilities.

## XXXV.        COSTS OF SUIT

132.  The United States and PRASA shall bear their own costs of this action, including attorneys' fees, except that the United States may be entitled to collect the costs (including attorneys' fees) incurred in any action necessary to collect any portion of the civil penalty or any stipulated penalties due but not paid by PRASA.

## XXXVI.        PUBLIC COMMENT

133.  Final approval of this Consent Decree by the United States is subject to the public notice and comment requirements of 28 C.F.R. § 50.7.  The United States may withdraw or withhold its consent if the public comments establish that entry of this Consent Decree would be inappropriate, improper, inadequate or otherwise not in the public interest. After reviewing the public comments, if any, the United States shall advise PRASA by motion whether it seeks entry of this Consent Decree.  Without further notice, PRASA agrees to the entry of this Consent Decree, as presented to the Court for lodging.

## XXXVII.        MODIFICATIONS

134.  No material modification shall be made to this Consent Decree without written agreement of PRASA and the United States and written approval of the Court, except as otherwise provided under this Consent Decree.  Any material modification to this Consent Decree shall be incorporated into this Consent Decree and shall be enforceable by the Court.  Any non-material modifications agreed to by the United States and PRASA shall be deemed incorporated into this Consent Decree and shall be enforceable by the Court.  Nothing in this Paragraph shall be deemed to alter the Court's power to supervise this Consent Decree.

PRASA may apply for a modification or extension of a deadline even though the basis for such modification does not satisfy the grounds for a force majeure event pursuant to Section XXVII (Force Majeure).

## XXXVIII.   RETENTION OF JURISDICTION

135.  The Court shall retain jurisdiction of this matter for all purposes, including overseeing implementation of this Consent Decree, until termination of the Consent Decree.

136.  The United States retains the right to enforce the terms of this Consent Decree and to take any other action authorized by federal, Commonwealth or local law to achieve or maintain compliance with this Consent Decree.

## XXXIX.   EFFECTIVENESS AND TERMINATION

137.  Unless otherwise provided herein, this Consent Decree shall be effective upon the date of its entry by the Court.

138.  Except for the records retention provision of this Consent Decree, this Consent Decree shall be terminated at the earlier of either: 1) the injunctive relief measures under the Decree  have been satisfactorily completed (including but not limited to completion of Remedial Measures at STSs, WWTPs and Puerto Nuevo Combined Sewer System; Sewer System Evaluations; Sewer System Programs concerning the Puerto Nuevo RWWTP Sewer System; Specific Puerto Nuevo RWWTP Sewer System Remedial Actions; Puerto Nuevo RWWTP Sewer System Evaluations and Repairs; Area Of Concern Requirements; implementation of the IMP, PCS and SRCP; and Training and Additional Requirements for Operators) and stipulated penalties have been paid, or 2) fifteen years have passed from the

Date of Entry.  No later than ninety (90) days prior to the fifteen year anniversary of the Date of Entry of this Decree, PRASA shall submit to EPA, a complete description of all actions required under this Decree, if there are any projects not completed by the fifteen year anniversary of the Date of Entry of this Decree.  PRASA shall include with this submission the expected costs to complete the remaining actions described above.

139.   EPA may, or the EPA and PRASA may jointly, move to terminate the Consent Decree at any time.  If all of the remedial actions and capital improvement projects referred to in Sections V through XX (and the associated appendices) have been completed, PRASA may move the Court to terminate the Consent Decree.  Regardless of whether the remedial actions and capital improvement projects referred to in Sections V through XX (and the associated appendices) have been completed, the United States reserves its right to object to termination if any Facility is not complying with its NPDES Permit.

140.   Nothing herein shall relieve PRASA or any subsequent operator of PRASA's Facilities from the obligation to provide proper operation and maintenance at all Facilities as required by the CWA and regulations promulgated thereunder, and the terms and conditions of PRASA's NPDES Permits after termination of this Consent Decree.

141.   The United States and PRASA may jointly move at any time after the conditions in this Section have been met to terminate this Consent Decree based on their representation that all of its requirements have been satisfied.  PRASA may unilaterally move to terminate this Consent Decree if (i) it has a good faith basis to believe that the conditions of this Section have been met; and (ii) it has unsuccessfully sought EPA's concurrence that the conditions of this Section have been met.  PRASA's motion to terminate this Consent Decree shall only be granted if PRASA can demonstrate on the administrative record that EPA's

failure to concur that the conditions of this Section have been met is arbitrary and capricious or otherwise not in accordance with law.

142.  Nothing herein shall be construed to limit the authority of the United States to undertake any action against any person, including PRASA, to abate or correct conditions which may present an imminent and substantial endangerment to the public health, welfare, or the environment, or for any other violation of law or regulation.

So ORDERED this 23rd day of May, 2016.

s/ Jay A. Garcia-Gregory
_____
Honorable Jay A. Garcia-Gregory
United States District Judge

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Puerto Rico Aqueduct and Sewer Authority, et al.*, Civil No.

FOR THE PLAINTIFF UNITED STATES OF AMERICA:

JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resource Division
U.S. Department of Justice

Dated: *September 15, 2015*

PATRICIA A. MCKENNA
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
601 D St., N.W.
Washington, D.C.  20004

ROSA E. RODRIGUEZ-VELEZ
United States Attorney
District of Puerto Rico

HECTOR E. RAMIREZ
Assistant United States Attorney
District of Puerto Rico
Torre Chardon Suite 1201
350 Carlos E. Chardón Avenue
San Juan, Puerto Rico 00918

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Puerto Rico Aqueduct and Sewer Authority, et al.,* Civil No.

Dated: 9/14/15

CYNTHIA GILES
Assistant Administrator
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
William Jefferson Clinton South Building
1200 Pennsylvania Ave., N.W.
Washington, D.C. 20460

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Puerto Rico Aqueduct and Sewer Authority, et al.,* Civil No.

Dated: 9/15/15

ERIC SCHAAF
Regional Counsel
EPA Region II
290 Broadway
New York, New York

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of United States v. Puerto Rico Aqueduct and Sewer Authority, et al., Civil No.

FOR THE DEFENDANT PUERTO RICO AQUEDUCT AND SEWER AUTHORITY:

Dated: _____

ALBERTO M. LÁZARO CASTRO
Executive President
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 7066
San Juan, Puerto Rico 00916

Dated: _____

FRANCISCO MARTÍNEZ CASTELLO
Vice President of Operations
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 7066
San Juan, Puerto Rico 00916

Dated: _____

RAQUEL MATOS ROLÓN
General Counsel
JORGE MARRERO NARVÁEZ
Assistant Legal Counsel
Office of General Counsel
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 7066
San Juan, Puerto Rico 00916-7066

Dated: _____

IRMA M. LÓPEZ SANTOS
Executive Director,
Compliance and Quality Control Directorate
Puerto Rico Aqueduct & Sewer Authority
Compliance and Quality Control Office
P.O. Box 7066

San Juan, Puerto Rico 00916-7066

Dated: _____

LYNNETTE M. RAMIREZ RIVERA
Executive Director, Infrastructure
Puerto Rico Aqueduct & Sewer Authority
Infrastructure Office
P.O. Box 7066
San Juan, Puerto Rico 00916-7066

Dated: _____

ROBERTO W. MARTINEZ TOLEDO
Executive Regional Director, Metro Region
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 7157
San Juan, Puerto Rico 00922

Dated: _____

DORIEL L. PAGAN  CRESPO
Executive Regional Director, North Region
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 475
Arecibo, Puerto Rico 00612

Dated: September 14, 2015

JOEL LUGO ROSA
Executive Regional Director, West Region
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 3290
Mayaguez, Puerto Rico 00681

Dated: _September 10, 2015_

_____
HECTOR GIERBOLINI PÉREZ
Executive Director, South Region
Puerto Rico Aqueduct & Sewer Authority
Apartado 7697
Ponce, Puerto Rico 00732

Dated: _September 10, 2015_

_____
ROBERTO GUZMÁN VELÁZQUEZ
Executive Director, East Region
Puerto Rico Aqueduct & Sewer Authority
P.O. Box 5729
Caguas, Puerto Rico 00726

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States v. Puerto Rico Aqueduct and Sewer Authority, et al.,* Civil No.

FOR THE DEFENDANT THE COMMONWEALTH OF PUERTO RICO:

Date: 9/10/2015

Honorable César R. Miranda
Attorney General
Puerto Rico Department of Justice
PO Box 9020192
San Juan, PR  00902-0192
(787) 721-7700